**In re Annie WILLIAMS, Appellant.**

**No. 83–135.**

District of Columbia Court of Appeals.

Argued Sept. 27, 1983.

Decided Jan. 9, 1984.

Marion E. Baurley, Washington, D.C., appointed by this court, for appellant.

Gary S. Freeman, Asst. Corp. Counsel, with whom Judith W. Rogers, Corp. Counsel, at time brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for appellee.

Before KERN, NEBEKER and TERRY, Associate Judges.

PER CURIAM:

This is an appeal from the trial court's denial, after an evidentiary hearing, of appellant's petition for a writ of habeas corpus. The petition challenged the lawfulness of her transfer by the Department of Human Services (the Department) from a so-called residential community facility to the District of Columbia institution of Forest Haven and her enforced subsequent residence there.

The record reflects that appellant is mentally retarded and has been in the care of the Department for a number of years. In October 1982, while appellant was residing in a residential community facility pursuant to an arrangement by the Department with the individual who owned and maintained such facility, she was suffering from hallucinations that an unknown man was attempting to kill her. This condition caused the director of the community residential facility on October 29 to advise the Department's caseworker, who was directly responsible for supervising appellant, that appellant could no longer remain in the residential facility.[1]

This caseworker confirmed to his satisfaction that appellant was hallucinating, and in response to the facility director's refusal to take appellant back in her condition, sought on the same day to have her admitted to the Area C Mental Health Clinic or Howard University Hospital or the Washington Hospital Center. None of these facilities would admit her. Accordingly, the Department's caseworker, without notice to appellant or her counsel and without approval by the trial court, transferred appellant to Forest Haven, an institution which concededly imposed more restraints on her than the community residential facility in which she had been living.

The trial court, at the hearing on January 5, 1983 on appellant's petition challenging

---

1. The District could not force the director of this facility to continue caring for appellant because the contract with the facility had not been finalized.

her transfer to and residency at Forest Haven, heard the testimony of three witnesses on behalf of the Department. In essence, their testimonial position was that Forest Haven was an appropriate facility for appellant, given her condition at the time which required medication in sufficient dosages to combat her delusional state. Appellant's contention, vigorously presented by conscientious counsel, was that the Department's transfer without prior notice or judicial approval had been contrary to the applicable statute[2] and that her continuing confinement at Forest Haven was therefore unlawful.

The trial court disagreed with appellant's contention and denied her petition, concluding that under the circumstances of appellant's then mental state there was no available facility other than Forest Haven suitable for appellant. Appellant moved for reconsideration and the trial court again denied her petition but expressly directed the Department to "take such steps as are necessary to find and to place Ms. Annie Williams in the least restrictive environment consistent with her physical, mental, and emotional needs...." The court also noted that the matter of appellant's confinement at Forest Haven would be subject to review by a judge of the trial court in 60 days.[3]

■ We are not persuaded that the trial court's rulings before us on appeal were error under the facts and circumstances developed at the hearing of January 5, 1983. The testimony of the psychologist attending appellant was that her hallucinating and delusional condition required carefully supervised medication in varying dosages, depending upon her reactions to such medicine. At Forest Haven, the witnesses asserted appellant could receive this treatment, whereas they doubted she would have sufficient supervision of her medical needs if released to the community. Although we cannot say the trial court's refusal to issue the writ to release appellant at that time was error, this is not to say that the confinement of appellant at Forest Haven *today* is appropriate. We leave it to appellant's resourceful counsel to pursue through the proper procedures the matter of her client's current situation.

The government contends that the Department's transfer to Forest Haven without prior court approval was authorized under D.C.Code § 6–1934 (1981).[4] Section 6–1934 permits the transfer of a mentally retarded person without prior notice and court approval solely for the purpose of respite care. Respite care is defined elsewhere in the statute as the

... temporary overnight care provided to a mentally retarded person in a hospital or facility, upon application of a parent, guardian or family member, for the temporary relief of such parent, guardian or family member, who, normally provides for the care of the person. [D.C.Code § 6–1902(23) (1981).]

The government argues that the Department, by reason of its role as caretaker of or provider to appellant, would therefore come within the meaning of the term "guardian." We do not find the government's argument persuasive in light of the statute's legislative history.

■ In order to properly construe the meaning of the word "guardian" as contained in Section 6–1902(23), "[w]e must

---

2. D.C.Code §§ 6–1901 to –1985 (1981).

3. Appellant's attorney at oral argument informed the court that the 60-day review did not take place.

4. D.C.Code § 6–1934 provides in pertinent part:
   (a) The Department of Human Services shall promulgate rules and regulations governing the provision of respite care for mentally retarded persons. These shall provide that period of *respite care* shall not exceed 42 days in a 12-month period without specific authorization by the Court after a hearing ... (b) Should any person be detained for a period exceeding 42 days in a 12-month period without specific authorization by the Court after a hearing ... he or she shall be promptly discharged. (Emphasis added.)

first look at the statute by itself to see if the language is plain and admits of no more than one meaning." *Davis v. United States,* 397 A.2d 951, 956 (D.C.1979); *see United States v. Young,* 376 A.2d 809 (D.C. 1977). The term "guardian", particularly in the context of the other statutory terms "parent" and "family member", would seem to encompass only a person rather than a governmental department as the District argues here. Given the uncertainty whether the term "guardian" includes the Department, we conclude that resort to the legislative history of the statute is appropriate. "Where the words are ambiguous, the judiciary may properly use the legislative history to reach a conclusion." *Sanker v. United States,* 374 A.2d 304, 307 (D.C.1977), quoting *United States v. Public Utilities Commission,* 345 U.S. 295, 315, 73 S.Ct. 706, 717, 97 L.Ed. 1020 (1953).

■ In our view, the legislative history resolves the apparent ambiguity against the District's interpretation that the Department is entitled to invoke the proviso for respite care for mentally retarded persons. The District of Columbia Council, in enacting the statute, *viz.,* the "Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978," specifically intended that the respite care provision was to give respite to the *family* caring for the mentally retarded person when the family needed to be temporarily away, all in an effort to promote and maintain close family ties. Thus the Council's Committee stated:

> Respite care means the temporary residential care, required due to serious illness in his *family* or the *family's* need to be away—for a funeral, wedding, vacation, etc. The availability of such care is a *key element in any program designed*

to maintain the close family ties of the retarded person.

Committee on Human Resources and Aging, Committee Report on Bill 2–108, "Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978." (Emphasis added).

■ Given the emphasis in the legislative history on maintaining family ties with a mentally retarded person, the specific examples given by the Council's Committee that so clearly apply to the exigencies of family living, and the absence of any mention by the Council of the need to afford respite care in order to maintain ties between a mentally retarded person and a government agency, we are persuaded that the term "guardian", as used in the definition of respite care, does not include a government entity such as the Department, even if it acts as a provider of care to a mentally retarded person. Accordingly, we conclude the Department was not entitled to transfer appellant without notice or hearing under the so-called respite care proviso.

We add that even if we were to accept the government's argument that respite care is applicable to the situation in the instant case, the hearing by the court in the habeas proceeding, which considered the propriety of appellant's continued stay at Forest Haven, did not take place until January 5, 1983, 68 days after appellant had been transferred to Forest Haven—well beyond the time allowed by the statute for respite care.[5]

■ It is quite clear that the action taken by the Department, *viz.,* transferring appellant who was hallucinating to a more restrictive setting than her Individual Habilitation Plan (IHP)[6] called for, was contrary to the applicable statute because such trans-

---

**5.** The statute requires a court order (after a hearing) in order to detain a person past the 42-day limitation on respite care. Section 6–1934, *supra,* n. 4.

**6.** A so-called IHP is a written report, prepared by persons with experience in the diagnosis

and habilitation of mentally retarded persons, submitted to the Court which sets forth each mentally retarded person's needs and habilitation goals and the least restrictive environment necessary to achieve these goals. D.C.Code § 6–1943 (1981).

fer was effected by the Department without notice to counsel and without approval by the court.[7]

Nevertheless, we conclude that "the legal imperfection of the original detention [at Forest Haven on October 29th]" was "remedied" by the hearing held by the trial court on January 5, 1983, and by the court's ruling that confinement at Forest Haven was warranted under the then circumstances. *Williams v. Meredith*, 407 A.2d 569, 574 (D.C.1979).

Accordingly, the trial court's denial of appellant's petition for writ of habeas corpus and denial of appellant's motion for reconsideration are affirmed without prejudice to appellant undertaking the appropriate proceedings to obtain review of her current situation.

*Affirmed.*

---

**7.** The applicable statute provides that a mentally retarded citizen shall not be transferred from one facility to another without notice to such person's counsel. It is undisputed that such notice was not given in the instant case. If the proposed transfer is "to a more restrictive facility," as was conceded to be the case here, "a mandatory hearing shall be conducted promptly." Section 6–1929(a). All agree that no such hearing was held prior to appellant's transfer to Forest Haven.

While a proviso of the statute permits a transfer without prior judicial hearing "in an emergency situation when the life of the resident is in danger", there is nothing in this record to show that appellant was in a life-threatening situation when her caseworker placed her at Forest Haven due to her hallucinations. Section 6–1929(c).

It would appear that, as here, where it was reasonable to believe that a mentally retarded person was suffering from a condition that was *not* life-threatening but nevertheless required close medical supervision available only in a setting more restrictive than a community residential facility, the Department ought to be able to seek court approval, after notice, on an emergency basis. Since there is no authority under the statute by which the Department can presently do this, legislation promulgating an appropriate provision in the statute governing the case of mentally retarded persons would appear necessary.