**In re Jerome RICHARDSON, Appellant.**

**In re Leonard CADE, Appellant.**

**UNITED STATES, Appellant,**

**v.**

**In re Carlton ELLERBEE, Appellee.**

**Nos. 82–940, 82–941 and 83–146.**

District of Columbia Court of Appeals.

Argued Oct. 12, 1983.

Decided Aug. 24, 1984.

Skolnick, Public Defender Service, Washington, D.C., at the time the briefs were filed, for Jerome Richardson, Leonard Cade and Carlton Ellerbee.

Ann O'Regan Keary, Staff Attorney, St. Elizabeths Hospital, with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the briefs were filed, Michael W. Farrell and Wendy Bebie, Asst. U.S. Attys., and Maxine M. Harrington, Staff Atty., St. Elizabeths Hospital, Washington, D.C., were on briefs, for U.S.

Before PRYOR and ROGERS, Associate Judges, and REILLY, Chief Judge, Retired.

PRYOR, Associate Judge:

These consolidated appeals are taken from final orders committing Cade, Richardson and Ellerbee to the supervision of St. Elizabeths Hospital (Hospital) pursuant to the District of Columbia Hospitalization of the Mentally Ill Act, D.C.Code § 21–501 *et seq.* (1981) (Act).

Our question concerns the appropriate procedures to be followed when reexamining a mentally ill individual, on an inpatient basis, who has previously been permitted to live in the community. Upon review of the record, we set forth certain procedures which we believe are consonant with the Act and the Constitution.

I

*Cade and Richardson*

Leonard Cade was admitted to the Hospital as an emergency patient in March 1982, upon the application of Dr. Yavit, an accredited officer of the District of Columbia Department of Health. *Id.* §§ 21–521, –522. In his application, Dr. Yavit observed that Cade had discharged himself from the Hospital against medical advice in February of that year, and subsequently refused to admit himself voluntarily. The application revealed that Cade had difficulty controlling his behavior, noting that on the previous day he broke the front door of

Mark Carlin, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Jr., Public Defender Service at the time the briefs were filed, and Holly R.

his mother's home, threatened a relative with a knife, then suffered a broken arm and cut his mother when she tried to wrest the knife from him. Dr. Yavit further noted that Cade's condition improved when he used his medicine as prescribed, but that he had failed to comply with his treatment program and had been without medication for several weeks.

Jerome Richardson was admitted to the Hospital in April 1982, as an emergency patient pursuant to the application of a United States Park Police officer. In his application, the officer stated that Richardson had been observed nude, masturbating and attempting to gain entry to a locked building.

Immediately following the admission of Cade and Richardson, the Hospital petitioned the court for orders extending the emergency hospitalization of each, and soon thereafter, instituted civil commitment proceedings against both men pursuant to *id.* § 21-541(a). Subsequently, the Commission on Mental Health (Commission) conducted hearings, finding Cade and Richardson to be mentally ill and, as a result of their illnesses, likely to injure themselves or others. The Commission noted that Cade had been admitted to the Hospital on six occasions and was presently experiencing hallucinations and paranoid delusions that others wanted to harm him. In Richardson's case, the Commission observed that he had recently signed out of the Hospital against medical advice, and "eloped" from the institution numerous times in the past. The Commission added that without medication and appropriate treatment, Richardson's condition would deteriorate, yet noted that "he has been hostile about taking his medication which has required [that he] be placed in seclusion." The Commission concluded that the conditions of both men had been sufficiently stabilized to permit their return to the community, provided that each take his medication and abide by his treatment regimen.

■ Subsequently, Cade and Richardson appeared before the court, waived trial[1] and accepted the Commission's recommendation of commitment to outpatient treatment[2] under the Hospital's supervision. The court accepted the recommendation and entered final orders committing both men to outpatient treatment programs. Pursuant to the Hospital's request, the court incorporated into both commitment orders a provision authorizing the Hospital to return the patient summarily to the institution for no more than five days in the event his condition deteriorates or he fails to comply with the outpatient therapy program. The orders further provided that should the Hospital seek to detain the patient beyond the five-day period, it must petition the court to commit him for an indeterminate period of institutionalization; otherwise, he must be returned to the outpatient program.

1. Waiver of trial constituted an admission by the patients that they were mentally ill and dangerous to themselves or others, permitting the court to order any disposition appropriate under the Act. Section 21-545(b).

2. Outpatient release is a therapeutic strategy long recognized as effective in treating mental illness. *Covington v. Harris,* 136 U.S.App.D.C. 35, 43-44, 419 F.2d 617, 625-26 (1969); *Hough v. United States,* 106 U.S.App.D.C. 192, 196, 271 F.2d 458, 462 (1959). While in the community, the outpatient will experience the same pressures to which he must eventually adjust and, if successful, learn to live a normal, or nearly normal, life. Furthermore, the mental health professionals responsible for the patient's rehabilitation will be able to observe how he performs in the community and make an informed decision concerning his ability to live outside the Hospital.

The particular treatment program will vary with the needs of the individual patient, and we note that the trial courts have devised a number of programs that do not require hospitalization. *See, e.g., In re Johnson,* 103 Wash.D.L.Rptr. 505 (D.C.Super.Ct. Feb. 27, 1975) (placement of elderly individual in nursing home in lieu of institutionalization at the Hospital). The full range of alternate dispositions available outside the Hospital is discussed in Chambers, *Alternatives to Civil Commitment of the Mentally Ill: Practical Guidelines and Constitutional Imperatives,* 70 U.Mich.L.Rev. 1107, 1112-19 (1972).

Cade and Richardson appeal from the final orders of commitment, arguing that the temporary return provision fails to comport with either due process or the Act.

*Ellerbee*

On October 1, 1981, Carlton Ellerbee was admitted to the Hospital as an emergency patient after being subdued by police officers in his home where he had threatened to kill several members of his family. After a period of emergency observation and diagnosis, the Hospital filed a petition for Ellerbee's involuntary hospitalization. The Commission issued its report, noting that Ellerbee had been admitted to the Hospital on five previous occasions and had failed in the past to take his medication or comply with the outpatient therapy program. The Commission recommended that Ellerbee remain an inpatient at the Hospital until placement in a supervised residential facility could be arranged.

Ellerbee appeared before the court, waived trial and accepted the Commission's recommendation. The court determined that the least restrictive course of treatment for Ellerbee was indeterminate commitment to the Hospital, provided that he be released into the community as an outpatient once a suitable residential facility could be located. The court then issued a final order of commitment in accordance with its determination. The Hospital had requested the court to include in the final commitment order a provision similar to those incorporated into the Cade and Richardson orders authorizing Ellerbee's temporary return to the Hospital in the event of deterioration or noncompliance with the treatment plan. The court denied the request, concluding that it was without discretion to include the temporary return provision. The court ruled that should the

Hospital seek Ellerbee's temporary return to inpatient care it must adhere to certain procedures which the court concluded were mandated by due process and the least restrictive alternative doctrine embodied in the Act. These procedures require that where the Hospital determines the patient is likely to injure himself or others as a result of his mental illness unless immediately rehospitalized, it must file with the court an affidavit setting forth sufficient information to permit the court to find probable cause justifying the proposed temporary detention. The court is then to determine within twenty-four hours whether the patient should be returned to the Hospital for a period not to exceed five days. As in the Cade and Richardson orders, the court provided that if Ellerbee is returned, the Hospital must either release him after the fifth day or commence proceedings before the court seeking his indefinite return to inpatient care. Where the Hospital is unable to demonstrate that Ellerbee is in need of emergency rehospitalization, he may not be returned to inpatient care, even for a temporary period, until a judicial hearing is held and the court determines that the temporary detention is justified.

The Hospital, through counsel, the United States Attorney for the District of Columbia, appeals from the final order committing Ellerbee to outpatient treatment, asserting that the trial court erred in concluding that judicial review must precede Ellerbee's temporary return to inpatient care.[3]

## II

We begin with the premise that although properly committed to the Hospital's care, the outpatients retain interests

3. These orders are "final" for purposes of judicial review. D.C.Code § 11–721(a)(1) (1981). In each case, the court committed the patient to an indeterminate course of involuntary treatment and in so doing "disposed of the whole case on its merits, [leaving] the court [with] nothing remaining to do but [docket the order] already [issued]." *McBryde v. Metropolitan Life Ins. Co.,* 221 A.2d 718, 720 (D.C.1966). *See Davidson v. United States,* 467 A.2d 1282 (D.C. 1983) (appeal from condition of work release); *Butler v. United States,* 379 A.2d 948 (D.C.1977) (appeal from conditional sentence); *Willis v. United States,* 250 A.2d 569 (D.C.1969) (appeal from condition of probation).

entitled to certain procedural safeguards. *In re Mills,* 467 A.2d 971 (D.C.1983); *see Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). One such safeguard, incorporated into each of the commitment orders under review, is that the individual be accorded a prompt adversary hearing before the committing court prior to the permanent revocation of his outpatient release. *In re Mills, supra,* 467 A.2d at 975 (and cases cited); *Darnell v. Cameron,* 121 U.S.App.D.C. 58, 348 F.2d 64 (1965). *See In re True,* 103 Idaho 151, 645 P.2d 891 (1982); *In re Bye,* 12 Cal.3d 96, 524 P.2d 854, 115 Cal.Rptr. 382 (1974), *cert. denied sub nom. Procunier v. Bye,* 420 U.S. 996, 95 S.Ct. 1437, 43 L.Ed.2d 679 (1975).[4]

The narrow issue here is whether the commitment order may authorize the patient's summary return to the Hospital for a brief period of reevaluation and treatment in the event his condition deteriorates or he fails to comply with the terms of the outpatient treatment program.

Involuntary judicial commitment of the mentally ill is authorized by D.C.Code § 21–545(b), which provides in part:

> If the court or jury finds that the person is mentally ill and, because of that illness, is likely to injure himself or other persons if allowed to remain at liberty, the court may order his hospitalization for an indeterminate period, or order any other alternative course of treatment which the court believes will be in the best interests of the person or of the public.

In fashioning a program of therapy best suited to the needs of a particular patient, the court must consider the interests of both the patient and public. *Lake v. Cameron,* 124 U.S.App.D.C. 264, 364 F.2d 657 (1966) (en banc). Inherent in this determination is the requirement that the court satisfy itself that no less restrictive therapeutic regimen would serve the purposes of commitment. *Covington v. Harris, supra; Lake v. Cameron, supra.* In this context, we have recognized that § 21–545(b) affords the court with the flexibility necessary to devise an appropriate course of treatment. *In re Kossow,* 393 A.2d 97, 107 (D.C.1978); *see In re Shuler,* 422 A.2d 996 (D.C.1980).

When committing individuals to a course of outpatient therapy, exposing them to the pressures of life in the community, the court may reasonably anticipate that, in some instances, a patient's condition will deteriorate or that he will not comply with the terms of his release. In such a case, it is fully consistent with the interests of the individual and public and compatible with the least restrictive alternative requirement, for the court to authorize the Hospital to return the individual to a brief period of inpatient observation where reevaluation or treatment appear to be clinically warranted.[5] The medical histories of Cade, Richardson and Ellerbee demonstrate that the return of an outpatient to institutional care is not an unusual or isolated event, but simply a part of the process of rehabilitation. For example, each of these individuals has been commit-

---

**4.** At the permanent revocation hearing the Hospital must establish that inpatient therapy is now the least restrictive alternative compatible with the ends of rehabilitation. *See Friend v. United States,* 128 U.S.App.D.C. 323, 388 F.2d 579 (1967).

**5.** Not every instance of the outpatient's failure to take prescribed medication or attend therapy sessions justifies the conclusion that he is not cooperating with the treatment program. Hiday & Goodman, *The Least Restrictive Alternative to Involuntary Hospitalization, Outpatient Commitment: Its Use and Effectiveness,* 10 J. Psychiatry & L. 81, 89 (1982). Yet we are aware

that without the steadying influence of medication and other features of the outpatient program, certain patients may become violent or return to the habits and misperceptions that led to their original commitment. *See In re Nelson,* 408 A.2d 1233, 1236 (D.C.1979); *see generally* Gumrukcu & Mikels, *Combatting Post-hospital Bends: Patterns of Success and Failure in a Psychiatric Halfway House,* 49 Mental Hygiene 244 (1965). Therefore, the Hospital must be accorded some measure of flexibility in determining when a particular patient is in need of institutional care.

ted to outpatient treatment programs in the past and experienced difficulty in adjusting to life in the community or the requirements of his treatment program. Thus, each record affords an ample factual predicate for including in the commitment order provisions authorizing the prompt reevaluations of these outpatients.[6]

■ We discern nothing in the Act requiring additional court involvement in the form of an adversary hearing prior to such temporary inpatient reevaluations. While the court decidedly must explore alternatives to institutional treatment at the time of commitment, § 21–545(b), the principle of the least restrictive alternative also guides the administrative decisions concerning the appropriate treatment and disposition of committed individuals. *Dixon v. Weinberger*, 405 F.Supp. 974 (D.D.C. 1975); *Covington v. Harris, supra.* The decision to return an outpatient to temporary institutional observation and treatment will be supported by the assessments of psychiatrists and staff members who have treated the patient and are familiar with his mental condition. In this circumstance, it would be unwarranted conjecture on our part to speculate that these assessments reveal anything other than an earnest determination that the best interests of the patient would be served by a brief return to the institution.

■ Yet we recognize that the Act charges the court with the duty to become actively involved in the rehabilitative process. *Lake v. Cameron, supra; Coving-*

 *ton v. Harris, supra. See also* Super.Ct. Ment.H.R. 7 (permitting the court to schedule a prompt hearing on its own initiative to determine whether the conditions of an outpatient's release have been implemented satisfactorily). We further recognize that the Hospital staff, or those upon whose information they rely, may err in concluding that the outpatient has violated a condition of his release or has become increasingly disoriented. The prospect of error is somewhat enhanced by the possibility that in certain instances, the friends or relatives of an outpatient may seek his return to the institution because they feel uncomfortable in his presence or are dissatisfied with the progress he is making toward rehabilitation. In order to assure that the court is fully afforded an opportunity to determine that the temporary return is appropriate, and not motivated by concerns incompatible with the goals of the Act, we conclude that the Superintendent of the Hospital must provide the court with an affidavit within twenty-four hours of the patient's return to the institution.[7] The affiant must recite the recent actions of the patient and the reasons for his return in sufficient detail, enabling the court to make a prompt, *ex parte* determination that the patient has failed to abide his treatment regimen or has suffered a deterioration in his condition. Thus, the court will make an affirmative finding on the basis of the affidavit that the Hospital's actions are supported by probable cause. *Cf. Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975).[8]

---

**6.** We do not suggest that a summary return provision must be incorporated into every final order committing an individual to outpatient treatment. Rather, the Hospital should be granted the authority only where, in light of the patient's condition and medical history, such a provision appears warranted.

**7.** We recognize that in certain situations, the Hospital authorities will not be able to return the patient promptly or peacefully. At oral argument, counsel for the Hospital informed the court that in these cases the Hospital will continue its practice of requesting the trial court to order the patient's detention.

**8.** In the case of Carlton Ellerbee, the court interpreted the Act as requiring the use of separate procedures for emergency and non-emergency reevaluation. We conclude that the Act does not compel the use of these contrasting procedures. Although a deteriorating or uncooperative patient may not yet need emergency treatment, it is likely that unless returned immediately, his condition will deteriorate further and he will be required eventually to spend more time under inpatient care than if the Hospital had been permitted to return him for a short period of stabilization the moment his perceptions or condition deteriorate. Such a result is hardly consistent with "the best interests of the

■ We further conclude that the patient's counsel must also be provided with a copy of the affidavit within twenty-four hours of the patient's return. Timely written notice will enable counsel to confer promptly with the patient and accords with the Act's mandate that involuntarily committed individuals be afforded the benefit of counsel. *Id.* § 21–543; Super.Ct.Met. H.R. 11. *See* D.C.Code § 1–2702(a)(1)(C). *See generally* Cyr, *The Role and Functions of the Attorney in the Civil Commitment Process: The District of Columbia's Approach,* 6 J. Psychiatry & L. 107 (1978). Additionally, both the patient and his counsel shall be informed in writing that the Hospital must either release him after the fifth day of institutional care and observation, or thereafter move for a prompt adversary judicial hearing seeking the permanent revocation of his outpatient status. *Cf. id.* § 21–544 (involuntary committee must be accorded written notice of procedural rights).

When accompanied by these procedures, we conclude that it is entirely consistent with the court's broad statutory power to fashion a final order of commitment and provide the Hospital, in appropriate circumstances, with the authority to summarily hospitalize the patient for a brief period of observation and treatment.[9]

person or the public." D.C.Code § 21–545(b) (1981). *See In re Williams,* 471 A.2d 263, 267 n. 7 (D.C.1984).

Moreover, the court's requirement of an adversary hearing prior to reevaluation in nonemergency cases is inappropriate. Where the patient has failed to participate in the outpatient program for an extended period, a hearing preceding his hospitalization will be an empty exercise since the Hospital authorities will have had no opportunity to examine him prior to the hearing. Clearly, in order for the Hospital to determine that a temporary return is appropriate, the staff must be accorded a sufficient opportunity to observe the patient's present condition.

Similarly, we reject the contention that the Hospital must rely on the emergency provisions of the Act, *id.* §§ 21–521, –528, in accomplishing the outpatient's return. Resort to these procedures would be duplicative, the patient having already been lawfully committed. Thus, there is no need for a second parallel civil commit-

## III

■ Having concluded that these procedures satisfy the statute, we now undertake a constitutional analysis. Due process generally calls for the opportunity to be given "some kind of hearing" prior to the deprivation of a significant interest. *See Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). However, the Supreme Court has recognized that summary action may be justified in certain situations. *See, e.g., Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 677–80, 94 S.Ct. 2080, 2088–2090, 40 L.Ed.2d 452 (1974). The essential requirement of due process is simply that the affected individual be afforded an opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976) (citation omitted).

■ The determination of what process is due in a particular situation requires a careful assessment of the competing interests involved. *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). More precisely, consideration must be given to three factors: (a) the private interest affected by the governmental actions, (b) the risk of an erroneous deprivation of these interests through the proce-

ment proceeding since the sole question to be decided on a return is whether institutional care is now appropriate, not whether the patient is mentally ill and likely to injure himself or others.

9. A similar provision authorizing a mentally retarded individual's summary transfer to institutional care was found to be improper in *In re Williams, supra,* 471 A.2d at 266–67 & n. 7. However, there the relevant statute required that a hearing precede the proposed transfer. D.C.Code § 6–1929(a) (1981). We note that the Act under consideration in the present case does not impose a similar requirement. *Cf. Davidson v. United States, supra* (in concluding that the work release statute, § 24–461 *et seq.,* is remedial in nature, we held that the trial court was permitted to order restitution as a condition of work release despite the absence of specific statutory authorization for such a provision).

dures used as well as the probable value of the added procedural requirements, and (c) the government's interest and the extent to which it will be impeded by the use of additional safeguards. *Mathews v. Eldridge, supra,* 424 U.S. at 334–35, 96 S.Ct. at 902–03; *In re Mills, supra,* 467 A.2d at 975.

### A.

█ As an individual recovering from mental illness under the Hospital's care and supervision, the outpatient's interests are qualitatively different than those of citizens who have not been civilly committed. Although the patient has an interest in not being erroneously deprived of his freedom to remain in the community under the terms of the commitment order, he will not be as free as other citizens while undergoing outpatient therapy. The outpatient will be compelled to participate in a prescribed course of treatment and must abide severe restraints governing his freedom of movement. Similarly, as he lives a "controlled experiment with freedom," his actions will be scrutinized and evaluated by psychiatrists, family and the court. Further, any interest the outpatient has in not being labeled mentally ill is greatly attenuated here since he has been adjudicated as mentally ill and dangerous and institutionalized on numerous occasions in the past. As the Supreme Court has observed, "[o]ne who is suffering from a debilitating mental illness and in need of treatment is neither wholly at liberty nor free of stigma." *Addington v. Texas,* 441 U.S. 418, 429, 99 S.Ct. 1804, 1811, 60 L.Ed.2d 323 (1979). Moreover, the outpatient's interest in these cases is only in the continued enjoyment of his conditional release pending the outcome of certain medical and factual determinations due him. *See Mackey v. Montrym,* 443 U.S. 1, 11–12, 99 S.Ct. 2612, 2617, 61 L.Ed.2d 321 (1979).

In this context, the character of the outpatient's interest does not require the use of more exacting safeguards.

### B

█ A primary function of legal process is to minimize the risk of erroneous decisions. *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex,* 442 U.S. 1, 13, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979). However, the Due Process Clause "does not mandate that all governmental decision making comply with standards that assure perfect, error-free determinations." *Mackey v. Montrym, supra,* 443 U.S. at 13, 99 S.Ct. at 2618 (citation omitted).

█ Here, within twenty-four hours of the patient's return to the Hospital, the court and counsel will have received the Superintendent's affidavit disclosing the reasons for the return. Any risk of arbitrary or erroneous action by the Hospital will be minimized by the ability of the court to determine immediately whether the facts recited in the affidavit justify the temporary detention. *Cf. Gerstein v. Pugh, supra* (*ex parte* judicial determination of probable cause justifying post-arrest detention of an arrestee). Therefore, the period of hospitalization preceding review by the court is quite minimal. *See Fusari v. Steinberg,* 419 U.S. 379, 389, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975) ("the possible length of wrongful deprivation ... is a significant factor in assessing the sufficiency of the entire process").

The risk of error is further reduced by counsel's ability to initiate immediate remedial steps if necessary to safeguard the patient's interests. Moreover, this is not a situation in which no process will be afforded the individual before his outpatient release is permanently revoked. The Hospital may detain the patient without a full judicial hearing for a maximum of five days. In many cases, the patient will have been stabilized, treated and released back into the community before the fifth day. However, if the Hospital determines that further institutionalization is required, it must move for the hearing no later than

the fifth day of examination and observation.[10]

Finally, the risk to the outpatient of an erroneous determination does not compare in magnitude with the risk involved in the original commitment process. The question of whether to return a patient to temporary institutional evaluation and stabilization concerns the appropriate situs for involuntary treatment and is peculiarly medical in nature. *In re Anderson*, 73 Cal.App.3d 38, 47, 140 Cal.Rptr. 546, 552 (1977); *Dietrich v. Brooks*, 27 Or.App. 821, 827–28, 558 P.2d 357, 361 (1976).

Furthermore, at this juncture in the patient's rehabilitation, the probable value of a judicial hearing is not great. The decision to return the patient will be made by mental health professionals familiar with his medical history. The argument in favor of prior judicial review is weaker here than in the commitment context since the patient has been subjected to protracted observation and treatment by the Hospital staff. Thus, the Hospital is in a position to reach a well-informed decision concerning the need for immediate reevaluation and treatment.

We conclude that these procedures adequately guard against the erroneous deprivation of the outpatient's conditional release.

### C.

Lastly, we observe that the government has significant interests in the expeditious reexamination of committed individuals who fail to comply with the terms of outpatient treatment or suffer deterioration in the community. *In re True, supra,* 103 Idaho at 162, 645 P.2d at 902. To engraft upon this portion of the rehabilitation process the requirement of a prior adversary judicial hearing, with its attendant delays, is likely to thwart the effort to restore the individual to sanity. *See, e.g., Calero-Toledo v. Pearson Yacht Leasing Co., supra,* 416 U.S. at 679, 94 S.Ct. at 2089; *Mackey v. Montrym, supra,* 443 U.S. at 19, 99 S.Ct. at 2621 (summary action is justified where more strict procedures would "frustrate" or "undermine" a significant governmental interest). *Cf. Gerstein v. Pugh, supra,* 420 U.S. at 113, 120, 95 S.Ct. at 866. Mental illness is a dynamic condition, and speedy intervention is frequently necessary to prevent rapid deterioration of the patient's condition and behavior as well as preserve the advances made toward rehabilitation. Thus, proper timing is a critical factor in the effort to rescue an individual who is not adapting to life outside the institution.

Moreover, the interests of the patient and public are not served if the deteriorating or uncooperative patient must remain in the community during the time needed to prepare for and convene an adversary hearing. *In re True, supra; In re Bye, supra.*

In consideration of all these factors, we conclude that these procedures are in harmony with the dictates of due process.[11]

In conclusion, we hold that a trial court may authorize an outpatient's summary rehospitalization in certain situations, provid-

---

**10.** We conclude that this five-day period is of sufficient duration to permit the Hospital staff to decide whether an indeterminate term of institutionalization is now the least restrictive treatment regimen.

**11.** We observe that in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed. 656 (1973), the Supreme Court determined that due process requires an informal hearing prior to the detention of a parolee or probationer who has violated a condition of his release. However, in a subsequent case, the court observed that a principal justification for this predetention procedure was to preserve certain evidence admissible at the final revocation hearing. *Gerstein v. Pugh, supra,* 420 U.S. at 121 n. 22, 95 S.Ct. at 867 n. 22. We note that this is not a concern in the present case since the revocation hearing will be held promptly and typically only a short distance from the community in which potential witnesses reside. Moreover, the distinctions between parole or probation and outpatient therapy justify different procedural safeguards. *See, e.g., In re True, supra.*

ed the patient is detained only temporarily and the Hospital complies with the affidavit and notice requirements set out in Part II, *supra*.

The orders committing Cade, Richardson and Ellerbee are remanded to the trial court and shall be modified to conform with this opinion.[12]

*So ordered.*

---

12. In Ellerbee's case, the trial court shall first satisfy itself that a summary return provision is appropriate.