**In the Matter of G.T., Appellant.**

No. 88–FM–965.

District of Columbia Court of Appeals.

Argued April 20, 1992.

Decided July 31, 1992.

---

Nicholas J. Hluchyj, Washington, D.C., appointed by this court, for appellant.

Charles L. Reischel, Deputy Corp. Counsel, with whom John Payton, Corp. Counsel, and Robert J. Harlan, Jr., Asst. Corp. Counsel, were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and KERN, Senior Judge.

STEADMAN, Associate Judge:

Appellant, G.T., a mildly retarded adult, seeks to compel the District of Columbia to provide him and his wife, T.B., who also is mentally retarded, with a supervised apartment under the "Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978," D.C.Code §§ 6–1901 *et seq.* (1989) (hereafter "the Act"). The trial court denied appellant's motion on the ground that, on the particular facts of this case, compelling admission would be inconsistent with the habilitative purposes of the Act. We affirm.

## I

Appellant has resided intermittently in residential facilities for the mentally retarded in Maryland and the District of Columbia since he was eight years old. The instant proceeding in the District began in 1985 when appellant's guardian ad litem filed in Superior Court a petition for commitment pursuant to D.C.Code § 6–1924 (1989). Appellant was diagnosed as mildly, rather than moderately, retarded and thus was ineligible for commitment.[1] However, under circumstances not entirely clear from the record, appellant voluntarily was placed in a long-term group home in 1986.

Beginning in November of that year, appellant took several extended absences from the group home, culminating in his departure from the facility on February 14, 1987. On April 30, 1987, appellant filed a "Motion to Compel Admission of Respondent to a Residential Facility in the Least Restrictive Setting." In the motion, appellant stated that he and T.B., who apparently also had pending a petition for commitment to a residential facility,[2] had left their residential placements in order to live together, and that they had married on March 20, 1987. Appellant sought to require the District to place the couple together in a supervised apartment.

### A

The trial court held a hearing on G.T.'s motion to compel, receiving testimony from several District of Columbia officials familiar with G.T.'s circumstances. Among other witnesses, G.T.'s case manager testified that the Bureau of Community Services (BCS) had in 1987 prepared a revised Individual Habilitation Plan ("IHP")[3] for him, which recommended that G.T. receive non-resident support services rather than placement in a residential facility. Elaborating on this point, G.T.'s case manager testified that G.T. had failed to follow through on the recommendations for his habilitation set forth in his IHPs for 1986 and 1987. Specifically, in addition to appellant's unauthorized absences from the group home, appellant failed to attend his job training program, medical appointments, or counseling sessions, despite his agreement to participate in these services. During this time, T.B. also failed to attend family and individual counseling sessions. Based on G.T.'s actions, G.T.'s case manager concluded that the BCS "would be creating a dependency by putting [G.T.] in a supervised setting at this time," and she agreed with the assessment of G.T.'s psychologist in a 1987 psychological evaluation that "[u]ntil [G.T.] has demonstrated consistent willingness to participate in the counseling, vocational training and the vocational assessment which BCS has recommended for him, other services should not be provided. To provide him with what he wants as opposed to what he needs would only serve to further debilitate him in terms of emotional maturational matters." G.T.'s psychologist testified that G.T.'s failure to cooperate was not caused solely by his mental retardation, but rather that emotional problems were an independent source of

1. Commitment is defined as "the placement in a facility, pursuant to a court order, of an individual who is at least moderately mentally retarded ... without the consent of the individual." D.C.Code § 6–1902(4). The trial court's dismissal of the commitment petition is not challenged on appeal. Mildly retarded persons must go through the procedures for voluntary admissions in order to be admitted to a residential facility. *In re Bicksler,* 501 A.2d 1 (D.C.1985).

2. The record contains almost no evidence of T.B.'s circumstances beyond the assertions in appellant's motion to compel that T.B. also is mentally retarded, that she had filed a petition for commitment, and that she had been placed in some sort of residential facility. We thus do not understand appellant to rely upon any independent rights of T.B.

3. Section 6–1943 of the Act requires that the Court order a comprehensive evaluation of the mentally retarded person and an "individual habilitation plan" (IHP) if these reports do not accompany a petition for commitment. An IHP is a written report, prepared by persons with experience in the diagnosis and habilitation of mentally retarded persons, which sets forth the mentally retarded person's needs and habilitative goals as well as the least restrictive setting needed to achieve these goals. D.C.Code § 6–1943 (1989). Such an IHP was originally prepared in 1986 as a result of the petition for commitment and was revised in 1987.

the difficulties.[4]

In addition to this testimony, the trial court had before it both the 1986 and 1987 IHPs for appellant as well as various reports included with the IHPs. These documents contained considerable evidence relating to G.T.'s mental retardation and his failures to participate in the services recommended as necessary for his habilitation in his 1986 and 1987 IHPs. A report prepared by appellant's case manager noted that appellant's attendance at a job training program in which he was enrolled had been "sporadic" and that the several times he had requested transportation to the program he had failed to show up at the appointed time. The report concluded that appellant had failed to follow through on any arrangements regarding his habilitation, and that appellant "does not appear to be sincere in his request for services." Appellant's 1987 IHP elaborated on appellant's failure to avail himself of the available services, concluding that only non-resident support services should be provided until appellant had demonstrated a willingness to participate in his habilitation. Specifically, the IHP stated:

> There is a strong dependency need evident. That is, [G.T.] appears much more interested in being provided for by others than in providing for himself. Since coming under the care of MRDDA/BCS, he has consistently refused to cooperate with just those programming/habilitative measures which would result in his becoming independent. Specifically, he has refused to participate in therapy or counseling, refused to participate in a comprehensive vocational assessment, refused to remain at a group home placement provided for him, and refused to participate in a program at ROI geared to develop and maximize his vocational and work-adjustment skills, as well as lead to a full-time position there at minimum wage.... [I]t would be extremely coun-

terproductive in terms of [G.T.'s] emotional growth and development if he were to be provided an apartment by the [BCS] at no cost to him or his wife. If such a residence were provided, he would then have no motivation to work, develop his adaptive/social/vocational skills, or get the counseling and/or psychotherapy he so strongly needs in order to come to the point at which he will be able to provide these living arrangements for himself.

## B

The trial court largely credited the testimony of these witnesses, summarizing the situation as one where "[a]pparently [G.T.] wants something—just to have an apartment to live in without all of the necessary things that are required [of] him to ... give him the opportunity to be able to live alone without the District of Columbia interfering" in his life. The trial court further found that although appellant needed to be in a residential facility, his failure to be so placed was "not the District's fault," but rather flowed from appellant's refusal to participate in other services necessary to his habilitation. In so doing, the trial judge found that appellant's marital status was irrelevant to the impasse that had developed between appellant and BCS officials, noting instead that other married couples received services through BCS.[5] Rather than deny appellant's motion, however, the trial court ordered that the District find another vocational placement for appellant and continued the case in order to allow appellant to demonstrate his willingness to participate in the vocational training.

According to a Court status report prepared on April 14, 1988, appellant and his wife attended only two of the weekly family counseling sessions scheduled for him from December 14, 1987 to April 14, 1988, and failed to appear for appointments re-

4. Two other witnesses testified at the hearing. First, the Acting Chief for Residential Services for BCS testified that there were, "in some cases, individuals who are married living in apartments, supervised apartments," but that she did not know the current status of the

availability of placements for married mentally retarded couples. The other witness was excused as soon as it became clear that he was not personally familiar with G.T.'s case.

5. See note 4 *supra*.

garding a job referral. Furthermore, when the parties reconvened for the hearing,[6] the government stated that appellant had missed "a great deal" of his job training program since the December hearing. On this basis, the trial judge denied appellant's motion to compel placement, from which denial appellant takes the appeal now before us.

## II

The "Mentally Retarded Citizens Constitutional Rights and Dignity Act of 1978," D.C.Code §§ 6–1901 *et seq.* (1989), is a comprehensive piece of legislation covering the admission and commitment of mentally retarded persons to facilities in the District of Columbia. Appellant cites among its provisions relevant to his motion the statement of intent that the legislation "[s]ecure for each person who may be mentally retarded, regardless of ability to pay, such habilitation as will be suited to the needs of the person, and to assure that such habilitation is skillfully and humanely provided with full respect for the person's dignity and personal integrity and in a setting least restrictive of personal liberty." § 6–1901(a)(2).[7]

More specifically, appellant invokes the provision in the subchapter on "Rights of Mentally Retarded Persons" that "[a]ll mentally retarded persons have a right to habilitation and care suited to their needs, regardless of age, degree of retardation or handicapping condition." § 6–1961(a). "Habilitation" is defined in the Act as "the process by which a person is assisted to acquire and maintain those life skills which enable him or her to cope more effectively with the demands of his or her own person

and of his or her own environment and to raise the level of his or her physical, intellectual, social, emotional and economic efficiency. 'Habilitation' includes, but is not limited to, the provision of community-based services." § 6–1902(14). Thus, one of the salient intents of the Act is to "[e]ncourage and promote the development of the ability and potential of each mentally retarded person in the District to the fullest possible extent, no matter how severe his or her degree of disability." § 6–1901(a)(3).

We think these principles and provisions are entirely consistent with the trial court's conclusion that appellant's unwillingness to take part in the range of services that BCS officials determined were necessary to his habilitation defeated his motion to compel placement in a supervised apartment.[8] At oral argument, counsel for appellant vigorously asserted that the District's refusal to provide G.T. and T.B. with a supervised apartment constituted impermissible discrimination based on G.T.'s marital status. While we agree with appellant that a refusal by the District to accommodate a mentally retarded person's marital status in its provision of habilitative services would raise extremely troubling issues, the record in this case is devoid of any evidence of such discrimination. In particular, we cannot discern from the record before us any evidence that the trial court failed to take proper account of appellant's marital status. The trial court did not rely on appellant's marriage to T.B. as a factor in denying appellant's motion, focusing instead on the evidence of appellant's failure to cooperate in the other services offered to him. Indeed, the record suggests that the trial court assumed that the District had to accommodate appellant's marital status if his

---

6. Appellant reported for work the day of the hearing, and thus was not present either at the hearing or at a proceeding concerning a pending criminal case against him.

7. The phrase "least restrictive setting" used in appellant's motion appears in the statement of principles to govern the "design and delivery of care and habilitation services," which includes a provision that "[w]henever care in an institution or residential facility is required, it shall be in the least restrictive setting." § 6–1901(b)(3). *See also* §§ 6–1943(c)(5), (6).

8. We, as apparently did the trial court, proceed on the assumption that appellant otherwise would be entitled to the facility he sought. We therefore do not reach the broader questions— forcefully advanced by Corporation Counsel on appeal but not argued to the trial judge at the hearings on the motion—relating to whether the Act authorizes the Court to compel admission of a mildly retarded person to a residential placement and, if so, under what circumstances. *See In re Bicksler, supra* note 1.

habilitation warranted placing him in a supervised residential environment. In this regard, the court characterized appellant's marital status as "understandable" and requested assurances from the government that it was possible, provided that appellant cooperated in the implementation of his IHP, for appellant to remain married and receive the benefits he needed. Under these circumstances, appellant's claim of discrimination based on his marriage to T.B. must fail.

More generally, the record supports the trial court's finding that appellant had failed to cooperate with the District in its provision of services, and that this failure, rather than any shortcoming on the part of the District, explained why the District had not placed appellant and his wife in the desired supervised apartment. *See In re Williams*, 471 A.2d 263, 265 (D.C.1984) (reviewing for error trial court findings based on testimony of witnesses in mental retardation proceeding); D.C.Code § 17–305(a) (1990). The record is replete with evidence of the District's efforts to provide counseling and medical services to appellant, as well as of appellant's unauthorized absences from the group home. Of particular significance to the trial judge, appellant failed to participate in the job training program in which he was enrolled. Uncontroverted testimony established that appellant repeatedly refused to participate in the program, sometimes for months at a time, even when the District, upon his request, made door-to-door transportation available to him. The trial court's conclusion that appellant bore sole responsibility for the failure to provide him with necessary support services was further supported by the evidence at the June 29, 1988 hearing that appellant had infrequently attended the job training program even after the trial judge had conditioned any grant of appellant's motion on appellant's participation in that program.

Nor can we say that the trial court was in error in its ultimate conclusion that, un-

der the particular circumstances of the case, providing appellant with a supervised apartment would not provide the necessary habilitation. As already indicated, a principal purpose of the Act is to achieve maximal "habilitation." It is evident that the trial judge kept this statutory framework in mind when ruling on appellant's motion, and it was well within his purview to credit the expert testimony that providing appellant with a supervised apartment, when he had failed to participate in other services that he needed, would undermine the District's efforts to habilitate him. *See Williams, supra*, 471 A.2d at 365. The 1986 and 1987 IHPs before the trial judge, as well as the oral testimony, supported the trial court's conclusion that a supervised apartment could not be viewed in isolation, but rather was a component of an integrated plan for appellant's habilitation. Based on appellant's apparent unwillingness to accept the other components of this plan, the trial judge could properly conclude, in light of the testimony before him, that the habilitative goals of the statute would not be furthered by providing appellant with a supervised apartment.[9]

*Affirmed.*

---

**9.** The record simply does not support appellant's assertion—rejected by the trial judge as well—that appellant's participation in the nonresident support services was an unreasonable *quid pro quo* for placement in a supervised

apartment. Rather, all the evidence before the trial judge suggested that residential placement was but one component of a larger process of habilitating appellant as defined in the statute.