Herbert J. REESE, Jr., Appellant,

v.

UNITED STATES, Appellee.

Nos. 91–CO–604 to 91–CO–606.

District of Columbia Court of Appeals.

Argued May 8, 1992.

Decided Sept. 4, 1992.

Kenneth H. Rosenau, Washington, D.C., appointed by this court, for appellant.

Thomas R. Eldridge, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Colleen M. Kennedy, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and SULLIVAN, Associate Judges.

ROGERS, Chief Judge:

This is an appeal from an order revoking appellant's conditional release from Saint Elizabeths Hospital, pursuant to D.C.Code § 24–301(e) (1989 Repl.), where he has been confined upon being found not guilty by reason of insanity in 1975 of two counts of threats, two counts of Bail Reform Act violations, and one count of disorderly conduct.[1] Appellant contends, for the first time on appeal, that his due process and equal protection rights were violated because the trial judge failed to (1) make an explicit finding on the least restrictive treatment alternative, and (2) provide appellant with the same procedural rights as a civil committee. Appellant also contends that the trial judge erred in admitting into evidence letters that appellant had written to the Hospital staff, and that without the letters there was an insufficient basis to revoke his conditional release. We affirm.

I

Appellant, Herbert Reese, was committed to Saint Elizabeths Hospital on January 31, 1975, upon entering pleas of not guilty to threatening to " 'blow out [the] brains' " of Joyce Thomas, threats to Charles Dunn, disorderly conduct, and two counts of Bail Reform Act violations, and being found by the court to be not guilty by reason of insanity.[2] The orders of commitment directed that a hearing be held on March 18, 1975, to determine whether he was entitled to release.

---

1. This accounts for the three separate appeals.

2. Appellant, who was represented by counsel, waived his right to a jury trial.

After prior releases from and returns to the Hospital, the court, on August 31, 1988, ordered appellant to be placed on conditional release from the Hospital whereby he would be allowed to live at any address in the community deemed appropriate by the Hospital, and to return to the Hospital for weekly outpatient treatment, on the condition that he continue his medication and refrain from using illegal drugs or alcohol.[3] Two and one-half years later, on January 16, 1991, appellant was actually placed on convalescent leave, allowing him to live in the community on a full-time basis, returning to the Hospital only for regular appointments. A month later, on February 22, 1991, appellant was placed on unauthorized leave after he failed to keep his required outpatient appointments, and a bench warrant was issued for his arrest.

On February 25, 1991, appellant's counsel filed a motion for unconditional release from the Hospital pursuant to D.C.Code § 24–301(k).[4] Shortly thereafter, on March 10, 1991, appellant's girlfriend, with whom he lived, called the police to report that appellant had broken the chain on her front door, and she asked that the police arrest appellant. Appellant was arrested and returned to the Hospital. On March 18, 1991, the Hospital requested that the court revoke appellant's conditional release due to his failure to cooperate with the outpatient department and his deteriorated mental status.

A hearing was held, beginning on April 2, 1991, pursuant to D.C.Code § 24–301(e), on appellant's motion for unconditional release and the government's motion for revocation of appellant's conditional release.[5] The government presented the expert testimony of Dr. James Word, a clinical psychologist, and Dr. Catherine Liebhauser, a psychiatrist, both from the Hospital. The doctors agreed that appellant suffered from bipolar disorder, manic and paranoid personality disorder, and described appellant's condition on his return to the Hospital on March 12, 1991, as "very manic," "paranoid and dillusional [sic]," and "extremely hostile," such that he was placed in isolation on March 12 and 16, 1991. Dr. Liebhauser, on whose ward appellant had been since March 12, 1991, described appellant's behavior in the two weeks before the court hearing as "provocative" and "abusive," and indicated that appellant was currently on two drugs that were necessary to

3. The record shows that this was not appellant's first conditional release. On March 17, 1975, the Hospital filed a letter of March 14, 1975, recommending that appellant remain in "the maximum security setting of the Division of Forensic Programs (John Howard Pavilion)...." In 1977, twice in 1978, and in 1979 the Hospital notified the court that appellant had failed to return to his ward from privileges on the Hospital grounds. Appellant was returned to the Hospital by law enforcement officials. However, on October 25, 1979, the Hospital recommended appellant's conditional release. Hospital officials were of the opinion that Mr. Reese was not delusional or a danger to himself or others. The court conditionally released appellant on November 21, 1979. On March 25, 1980, the Hospital notified the court that appellant had again failed to return to his ward from ground privileges on March 20, 1980.

In January 1984, appellant filed a *pro se* motion seeking an extension of his conditional release, and alternatively sought an order directing the Hospital not to force him to take medication against his will. Counsel subsequently represented appellant. An independent expert was appointed to examine appellant. Defense counsel thereafter withdrew the request for a § 24–301(k) hearing.

On April 22, 1988, appellant was again placed on conditional release based on an April 18, 1988, letter from the Hospital recommending a gradual release over a four-month period. His conditional release was extended by court order on August 31, 1988. Because of a period of mental deterioration, appellant did not begin to utilize his conditional release until January 1991.

4. On February 25, 1991, appellant had filed a *pro se* motion for unconditional release. On February 22, 1991, appellant had been placed on unauthorized leave from the Hospital for failure to keep outpatient appointments; he had last been seen on February 13, 1991. He was returned to the Hospital on March 12, 1991. The court granted appellant's request for examination by an independent expert in preparation for a § 24–301(k) hearing.

5. At the beginning of the hearing, appellant's counsel indicated that he was "withdrawing [appellant's] request for specific relief, but we are opposing the motion to revoke." Counsel's motion, filed on appellant's behalf, had sought unconditional release, nothing else.

treat his mania. Dr. Word also referred to appellant's false and grandiose beliefs about himself, and that the psychiatric notes, by Dr. Liebhauser, indicated appellant's lack of insight, poor judgment, poor impulse control and hostile, angry and abusive behavior. Dr. Word testified further that appellant's hospital records showed that appellant had not acknowledged that he has mental problems and has "fought medication tooth and nail for years." Both doctors believed that appellant should not be allowed outpatient privileges and that he would pose a danger to himself or others if he were released into the community.

Both doctors also described letters written by appellant to members of the Hospital staff, between January 16, 1991, and March 12, 1991, when he was returned to the Hospital. In the letters, appellant stated that he was not taking his prescribed medication and that he was using illegal drugs. Dr. Word testified that the letters contained numerous delusional and sexual statements regarding female members of the Hospital staff.

Appellant offered the expert testimony of Dr. Eugene Stammeyer, a clinical psychologist. Based on his examination of appellant and on an evaluation of appellant's clinical record, Dr. Stammeyer testified that in his opinion, appellant was suffering from paranoid personality disorder and should not have been allowed to live outside of the Hospital in January 1991. However, while appellant was not ready for unconditional release, Dr. Stammeyer opined that appellant should be allowed to visit the community in order to work each day, returning to the Hospital at night, and allowed a weekend day in the community with his girlfriend.

Appellant testified that he was a well-known entertainer, had attended the Grammy Awards on a chartered plane with a man named Jimmy McPhail, and had bought marijuana for a woman friend while in New York to attend the Grammy Awards. He admitted that he had written several letters to the Hospital staff containing sexually explicit language in order to irritate and upset the staff. He also admitted that he had threatened to hurt someone on March 16, 1991, after he was returned to the Hospital, if he were not released, but he explained that this threat was a "desperate act" of a man who wanted to be out of the Hospital, and that he had never intended to follow through on it. He further explained that he had broken the chain on his girlfriend's door because he thought that she had taken too long to answer the door, and because, at the time, he was under a lot of stress because he was away from the Hospital illegally. Appellant denied that he was suffering from any mental illness, and although he admitted that he would benefit from treatment, including medication, he also admitted that he had been taken off medication at his own request.

Jimmy McPhail, a nightclub owner, testified that he had not chartered a plane with appellant and he had not gone to New York with appellant to attend the Grammy Awards.[6] Patricia Sullivan, appellant's girlfriend, testified that she had called the police on March 10, 1991, because appellant was not acting like himself on that day, and had kicked in her door and broken the chain on the door when he believed that she refused to let him into her apartment, and that she had become "upset." [7]

The trial judge granted the government's motion to revoke appellant's conditional release.

## II

Appellant contends that his due process rights were violated because the trial judge revoked his outpatient privileges without making an explicit finding that inpatient treatment was the least-restrictive alternative available for appellant. This constitutional contention was not raised in the trial

---

6. Doris Wilkerson also testified that appellant began to visit her church in December 1990, and he had subsequently joined the church and begun to sing in the choir.

7. A tape of Ms. Sullivan's telephone call to the police indicated, however, that she was more afraid of appellant than she testified in court.

court, and we find no clear error, much less plain error. *See DeVeau v. United States,* 483 A.2d 307, 315–16 (D.C.1984) (decision granting or denying conditional release will not be overturned unless plainly wrong or without evidence to support it); *Watts v. United States,* 362 A.2d 706, 708 (D.C. 1976) (en banc); *see also District of Columbia v. Bethel,* 567 A.2d 1331, 1334 (D.C.1990) (allowing appellant to raise issue where appellee "was precluded from making an appropriate record with respect to it in the trial court would be patently unfair"); *Williams v. Gerstenfield,* 514 A.2d 1172, 1177 (D.C.1986) (matters not properly presented to trial court will not be resolved on appeal, unless necessary to prevent a clear miscarriage of justice).

■ The court has recognized that due process is implicated when the government seeks to revoke a patient's outpatient status. *See In re James,* 507 A.2d 155, 157 (D.C.1986) (conditional liberty interest of civil committee); *see also In re Stokes,* 546 A.2d 356, 365 (D.C.1988) (conditional liberty interest in remaining outpatient); *In re Mills,* 467 A.2d 971, 975 (D.C.1983) (patient had legitimate expectation that he would continue in outpatient status unless the hospital was able to satisfy court that inpatient commitment least-restrictive-appropriate treatment). *See also Jones v. United States,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (the due process considerations are no different for criminal acquittees than civil committees).

■ Furthermore, the courts in this jurisdiction have emphasized the importance of an explicit finding that an involuntarily civilly committed mental patient is receiving the least restrictive treatment alternative available. *See James, supra,* 507 A.2d at 157; *Lake v. Cameron,* 124 U.S.App. D.C. 264, 364 F.2d 657 (1966). The concern has not been the absence of certain words in the judge's findings, but rather that the record reflect more than a conclusory finding that, if a less restrictive alternative were implemented, the civil committee is likely to be a danger to himself or herself or others. *James, supra,* 507 A.2d at 158. Thus, the record must indicate that the

trial judge explored other less restrictive alternatives to the complete revocation of conditional release and explained why revocation was the least restrictive alternative for the petitioner. *Id.*

■ A criminal defendant who is found not guilty by reason of insanity, pursuant to D.C.Code § 24–301(d)(1), may be granted a conditional release from the Hospital if the court finds that the acquittee, although mentally ill, "will not in the reasonable future be dangerous to [himself or herself] or others." *DeVeau, supra,* 483 A.2d at 311 (footnote omitted). The dual purposes of the statute are "first, the treatment and recovery of the patient, and second, the protection of society and the patient." *Jones v. United States,* 432 A.2d 364, 369 (D.C.1981) (en banc), *aff'd,* 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983); *cf. Foucha v. Louisiana,* —— U.S. ——, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (statute violates due process clause because it allows insanity acquittee to be committed to a mental institution until acquittee can demonstrate that acquittee is not dangerous even though acquittee does not suffer from any mental illness). As interpreted by this court, "the underlying policy served by § 24–301(e) is 'to provide treatment and cure for the individual in a manner which affords reasonable assurance of public safety.'" *DeVeau, supra,* 483 A.2d at 311 (quoting *United States v. Charnizon,* 232 A.2d 586, 589 (D.C.1967)); *see United States v. Ecker,* 177 U.S.App.D.C. 31, 53, 543 F.2d 178, 200 (1976); *see also Bolton v. Harris,* 130 U.S.App.D.C. 1, 12, 395 F.2d 642, 653 (1968). In other words, the courts "are charged with the ... task of assuring the best treatment for the acquittee *in a manner that protects the public safety." DeVeau, supra,* 483 A.2d at 312 (emphasis in original).

■ This suggests that, based on the different statutory schemes for civil and criminal commitments, the "least restrictive treatment" standard functions somewhat differently in criminal acquittee proceedings. The United States Court of Appeals for the District of Columbia Circuit pointed out in *Ashe v. Robinson,* 146

U.S.App.D.C. 220, 222, 450 F.2d 681, 683 (1971), that "[i]t is clear that one who by reason of insanity is acquitted of a crime and, after a *Bolton*[8] hearing, is committed to a mental hospital is entitled not only to treatment but to treatment in the least restrictive alternative consistent with the legitimate purposes of a commitment." Thereafter this court acknowledged that "retention of an insanity acquittee as an inpatient after it becomes clear that outpatient treatment is preferable would contravene the policy underlying the requirement that insanity acquittees receive the least restrictive alternative treatment." *United States v. Mendelsohn,* 443 A.2d 1311, 1317 (D.C.1982) citing *Ashe v. Robinson, supra,* and *Covington v. Harris,* 136 U.S.App.D.C. 35, 419 F.2d 617 (1969). The level of confinement is, of course, relevant to the inquiry that the judge has to make when an acquittee seeks a change in the manner of his confinement, or as here, to maintain his conditional release over objection of the government.[9] But, the statute not only limits conditional release of the mentally ill criminal acquittee to those who "will not in the reasonable future be dangerous to [himself or herself] or others," *DeVeau, supra,* 483 A.2d at 311 (footnote omitted); D.C.Code § 24–301(e), but places the burden of proof to demonstrate, by a preponderance of the evidence, entitlement to conditional release on the acquittee. *See* D.C.Code § 24–301(k)(3). Thus, the "least restrictive language" in *Mendelsohn, supra,* 443 A.2d at 1317, can only mean that the treatment must be "the best treatment for the acquittee," *DeVeau, supra,* 483 A.2d at 312, that "protects the public safety." *Id.* Indeed, in *Mendelsohn, supra,* 443 A.2d at 1317, the court expressly states that release would be appropriate only after "the patient fails to meet the criterion of dangerousness as a result of present mental illness." Moreover, the *Ashe* court qualified its statement of entitlement to the least restrictive treatment by the phrase "consistent with the legitimate purposes of a commitment." 146 U.S.App.D.C. at 222, 450 F.2d at 683.

In other words, to obtain a conditional release, the criminal acquittee must demonstrate that, if still mentally ill, he or she will not be a danger in the reasonable future. The nature of the acquittee's treatment while confined may be relevant to the level of custody, but it is to be weighed in the context of affording reasonable assurances of public safety, *DeVeau, supra;* as an isolated factor it would not entitle one to release from the Hospital. *Cf. State v. Lindquist,* 674 P.2d 1234, 1237–38 & n. 18 (Utah 1983) (rejecting claim that dual commitment, as criminal acquittee and civil committee, violates due process because it is not the least restrictive alternative method of treatment, citing *Ecker, supra,* 543 F.2d 178, and *Ashe, supra,* 450 F.2d 681; held, that trial court could not order release of criminal acquittee unless statutory burden of recovery of sanity is met). Viewed within the statutory scheme for criminal acquittees, we find no error by the trial judge.

Appellant's counsel argued to the trial judge that, if it was a mistake to have released appellant in January 1991, that mistake should not be the basis for the revocation of his conditional release. Rather, appellant should be allowed a transition period in which he would remain within the structure of the Hospital setting, receiving medication, and then be released, when his mental condition was stabilized, so that he could work, starting perhaps with work on the Hospital grounds, then off the grounds, and with the weekends on release. In other words, counsel argued that unless the Hospital was of the opinion that "things are not going well," it should "at least" allow appellant to do what Dr. Stammeyer had recommended.[10] Counsel pointed out

---

8. *Bolton v. Harris, supra,* 130 U.S.App.D.C. at 12, 395 F.2d at 653.

9. Our discussion in *DeVeau, supra,* 483 A.2d at 314–16, of the factors that the trial court must consider in determining whether to grant a conditional release is no less applicable here.

10. Counsel also urged the judge to view appellant's letters as statements consistent with his tendency to exaggerate. He further argued that the reason that appellant's girlfriend had called the police was not because she was personally fearful of him, but because they both knew that

that appellant had testified that he would take his medication.

The trial judge acknowledged that appellant presented an appealing case for maintaining his conditional release.[11] But the judge concluded that until appellant took his medicine to minimize the symptoms of his mental illness, he could not safely go into the community. The judge was confronted not only with evidence of appellant's conduct during his prior conditional release, but his delusional testimony. In addition to the expert psychiatric evidence that appellant had not benefitted from his outpatient status, was mentally unstable and had failed to take his medication while he was on conditional release, there was also the evidence of appellant's condition and conduct when he was returned to the Hospital on March 12, 1991. Combined with the evidence of appellant's lack of insight into his mental condition, the judge concluded that the government's motion to revoke should be granted. When the judge told appellant that he was revoking appellant's conditional release, appellant asked the judge if he could send him to jail, but the judge said he was without authority to do that and that, in any event, the jail would not provide the kind of help that appellant needed. The trial judge did not make an explicit finding that revocation of outpatient privileges was the least restrictive treatment alternative.

The trial judge concluded that if appellant "were permitted to avail himself of the privileges granted by the terms of ... hi[s]

conditional release, ... [he] would pose a danger to himself and others due to mental illness." In reaching that conclusion, the judge discussed with appellant's counsel, on the record, a proposal for a more restrictive form of conditional release short of revocation, along the lines recommended by Dr. Stammeyer. The judge expressly found that the alternative was inappropriate in light of the expert testimony from the Hospital and appellant's own testimony, his refusal when on release to take his medication, and the resulting behavior and deterioration in appellant's mental condition. The judge's colloquy with appellant's counsel, and with appellant himself, after all of the evidence had been received, makes clear moreover that the judge was of the view that present hospitalization was required in order to stabilize appellant's condition. Once that happened, the judge stated that he would be receptive to returning appellant to a form of conditional release from the Hospital. The judge's remarks about why it was important for appellant to return to the Hospital and take his medication clearly reveal the judge's view that there was no other less restrictive treatment consistent with properly treating appellant and protecting the public.

■ Accordingly, we find no violation of appellant's due process rights in the revocation of his conditional release.[12] See Jones, supra, 463 U.S. at 367–68, 103 S.Ct. at 3051 ("due process is flexible and calls for such procedural protections as the par-

appellant had to go back to the Hospital. Counsel further pointed out that two of the experts, Doctors Word and Stammeyer, disagreed on whether appellant would be a danger and that the third expert, Dr. Liebhauser, "could only say what Mr. Reese might do, and that is anything."

11. Appellant participated in argument to the trial judge, pointing out that while he has been in the Hospital he has never been in a physical altercation. He noted that he had been in the Hospital for 16 years for a Bail Reform Act violation, had difficulty adjusting to the Hospital, and did not have problems in the community because he worked. He told the judge that he was not a violent man, and that he "would much rather Your Honor send me to jail" because he would "fall apart" if he went back to

the Hospital. Finally, he stated that he did not "mind taking medication," and he appeared to indicate that he would take the medication if allowed to continue his conditional release.

12. Appellant's contention at oral argument that the trial judge erred by not making a least-restrictive-alternative determination with respect to the treatment program that appellant would receive in the Hospital if his conditional release were to be revoked, is raised for the first time on appeal, and appellant has cited no authority that the trial judge was required, under the circumstances of this case, to make such a finding. We find no plain error. See Watts, supra, 362 A.2d at 708; see also District of Columbia v. Bethel, supra, 567 A.2d at 1334; Williams v. Gerstenfield, supra, 514 A.2d at 1177.

ticular situation demands" (quoting *Morrisey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972))).

### III

 Appellant also contends that the trial judge erred by admitting into evidence letters that appellant had written to the Hospital staff while he was an outpatient, since the letters were not part of appellant's Hospital file. Because appellant did not object to the admission of the letters in the trial court, our review is for plain error. *See Watts, supra*, 362 A.2d at 708; *see also District of Columbia v. Bethel, supra*, 567 A.2d at 1334; *Williams v. Gerstenfield, supra*, 514 A.2d at 1177.

In considering whether to grant or revoke a patient's conditional release status, the trial judge may properly consider "the hospital records, files, and psychiatric history of the acquittee," as well as "the acquittee's demonstrated behavior, including the act for which [he] was prosecuted as well as any other prior crimes or bad acts." *DeVeau, supra*, 483 A.2d at 314–15. Appellant's letters to the Hospital staff were indisputably examples of his "demonstrated behavior," and hence properly admitted into evidence by the trial judge. Moreover, appellant has not demonstrated that he suffered any prejudice from the fact that the letters were not part of the Hospital's record. Although his expert witness did not review the letters (because they were not in the Hospital file), appellant had a full opportunity to cross-examine the government's experts' interpretations of the letters as well as to present his view of his letters. In addition, appellant's own expert, Dr. Stammeyer, testified that he knew of the existence and content of the letters, and that the letters did not change his opinion that appellant did not pose a danger to the community. Hence, we find no prejudice arising from appellant's expert's lack of opportunity to review the letters, and accordingly we find no plain error as a result of the admission of the letters.

### IV

 Finally, appellant challenges his continued confinement on equal protection and due process grounds.[13] In purporting to challenge the release provisions of the statute, D.C.Code § 301(e), appellant points to the fact that there has never been a jury trial in which the government has shown by clear and convincing evidence[14] that he is a danger to himself or the community. He also maintains, in view of the length of his confinement, that there is no basis for the presumption of continuing insanity and dangerousness.[15] These contentions are raised for the first time on appeal, and we find no clear miscarriage of justice. *See Watts, supra*, 362 A.2d at 708; *District of Columbia v. Bethel, supra*, 567 A.2d at 1334; *Williams v. Gerstenfield, supra*, 514 A.2d at 1177.

 Differences do exist between the release provisions applicable to civil committees and criminal acquittees. *See Walls v. United States*, 601 A.2d 54, 58 (D.C.1991). But appellant's statutory challenge does not refer to these differences. Rather, he contends first, that he is entitled, post-commitment, to a jury determination that he is mentally ill and dangerous by clear and convincing evidence. Such a jury trial is required for the initial commitment of a civil committee. D.C.Code §§ 21–544, –545 (1989 Repl.). Second, appellant maintains that the burden of proof at such a hearing should be on the government. This, too, is required at the initial civil commitment proceeding. *Streicher v.*

---

13. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (due process guarantee of the Fifth Amendment, which is applicable to the District of Columbia, encompasses the right to equal protection).

14. *See Addington v. Texas*, 441 U.S. 418, 432–33, 99 S.Ct. 1804, 1833, 60 L.Ed.2d 323 (1979) (clear and convincing standard of proof required by Fourteenth Amendment in civil proceeding brought to involuntarily commit individual for indefinite period).

15. Appellant's constitutional challenge based on the absence of an explicit finding that inpatient commitment was the least-restrictive alternative treatment is moot in view of our holding in Part II of this opinion.

*Prescott,* 663 F.Supp. 335, 345 (D.D.C. 1987); *Addington v. Texas, supra* note 13, 441 U.S. at 432–33, 99 S.Ct. at 1813. Lastly, appellant contends that his initial commitment, as a result of his not guilty by reason of insanity plea, cannot be used to hold him indefinitely on the basis of a presumption that he is mentally ill and dangerous, and that at some point he must be civilly committed or released. No such presumption appears in the statute as a factor to be considered in evaluating a conditional release request, *see* D.C.Code § 24–301(e), but arises in connection with the original commitment. *See* D.C.Code § 24–301(d)(2). The similarities between the contentions posed by appellant and those posed in *Jones, supra,* 463 U.S. 354, 103 S.Ct. 3043, demonstrate that appellant's challenge, although presented as an attack on the statute's release provisions, is instead a challenge to the initial commitment procedures. To that extent *Jones, supra,* 463 U.S. at 361, 103 S.Ct. at 3048, is dispositive.[16]

Although the Supreme Court in *Jones, supra,* 463 U.S. at 362–63 n. 10, 103 S.Ct. at 3049, did not address the constitutionality of the statute's release provisions, the Court specifically rejected the contention that because Jones had been committed for the maximum time he would have had to serve in prison for the underlying crime, he was entitled to his unconditional release or to be recommitted as a civil committee. 463 U.S. at 368, 103 S.Ct. at 3052. As the government points out, the only difference here is that appellant claims he is entitled to release or civil commitment at some undefined point in time, and clearly after seventeen years. Thus, in upholding the statute against challenges to the differences between the initial commitment procedures for acquittees and civil committees, this court's analysis is dispositive of appellant's contentions. In *Jones* this court stated:

[w]hile the jury trial right available to [a civil] committee is not similarly available to an acquittee in a 50–day release hearing, this difference is justified by the fact that the acquittee has had a right to a jury determination of his sanity at the time of the offense. Thus the acquittee's mental illness is initially established by affirmative proof. Dangerousness is no less validly established by proof that the defendant committed the criminal act, a finding necessarily underlying any acquittal by reason of insanity.

*Jones, supra,* 432 A.2d at 373 (footnote omitted). Likewise, regarding the burden of proof, this court in *Jones* concluded that it was:

entirely rational for the District to require an acquittee to prove his entitlement to release where he was the one to advocate the fact of his past insanity.... As mentioned above, the presumption that a mental condition continues is a reasonable one and it is also reasonable to require the person who raised the presumption to refute it by affirmative proof.

*Id.* at 374. Similarly, regarding the differences between the civil commitment standard of clear and convincing evidence and the criminal committee standard of a preponderance of the evidence, this court stated:

The difference between these two standards is justified by the fact that Congress determined that a defendant raising an insanity defense should not have to meet a higher burden on such a relatively difficult issue. However, when the District seeks to commit a person who is disputing the fact of insanity or dangerousness, it is reasonable that the risk of error be more heavily thrust upon the government.

*Id.* at 375. The Supreme Court, in affirming this court's decision in *Jones, supra,*

---

**16.** As the government points out, appellant's heavy reliance on the dissenting opinion of Justice Brennan in *Jones, supra,* 463 U.S. at 371, 103 S.Ct. at 3053, suggests an attempt to relitigate what the majority decided. Indeed, the dissenting opinion of Justice Brennan makes even clearer that the majority opinion in *Jones,*

while disclaiming any intention to address the release provisions, rejected the arguments that appellant presents. *See id.* at 371, 375, 381–83, 103 S.Ct. at 3053, 3055, 3058–59 (Brennan, J., with whom Marshall, J., and Blackmun, J., join, dissenting) and *id.* at 387, 103 S.Ct. at 3061–62 (Stevens, J., dissenting).

specifically held that "the Constitution permits the Government, on the basis of the insanity judgment, to confine [a defendant] to a mental institution until such time as he has regained his sanity or is no longer a danger to himself or society." *Jones, supra,* 463 U.S. at 370, 103 S.Ct. at 3053.

Moreover, the United States Court of Appeals for the District of Columbia Circuit has rejected an equal protection challenge to the differing release provisions for civil committees and criminal acquittees, concluding that there was a rational basis for the differences in the release provisions. *Ecker, supra,* 177 U.S.App.D.C. at 50–51, 543 F.2d at 197–98 (§ 301(d) "patients are treated differently from civil committees because they are 'an exceptional class of people' who have 'already unhappily manifested the reality of anti-social conduct' ") (footnotes and citations omitted). Thus, it has been clear in this jurisdiction that "the dangerousness demonstrated by the commission of a crime and acquittal by reason of insanity constitutes a rational basis for the disparity in release provisions governing acquittees and committees." *Id.* at 48, 543 F.2d at 195 (footnote omitted). Finally, as applied to appellant,[17] the statutory presumption of mental illness and dangerousness has been reaffirmed by reliable evidence as recently as the hearing in the instant case.

Therefore, because appellant's constitutional challenge is based on the same differences between the initial commitment of criminal acquittees and civil committees that the Supreme Court rejected in *Jones, supra,* 463 U.S. at 361, 370, 103 S.Ct. at 3048, 3053, we find no basis on which to conclude that appellant has demonstrated manifest injustice.[18]

Accordingly, we affirm the judgment.

---

**17.** *See Smith v. United States,* 445 A.2d 961, 967–68 (D.C.1982) (en banc).

**18.** Thus, we, like the Court in *Jones, supra,* 463 U.S. at 362–63 n. 10, 103 S.Ct. at 3048–49 n. 10, do not reach the question whether the release provisions, insofar as they differ from the release provisions for civil committees, are constitutionally suspect.