James L. BROWN, Appellant,

v.

UNITED STATES, Appellee.

John R. MARLOWE, Appellant,

v.

UNITED STATES, Appellee.

Nos. 93–CO–124, 94–CO–74 and 94–CO–75.

District of Columbia Court of Appeals.

Argued April 4, 1995.

Decided Sept. 26, 1996.

James Klein, Public Defender Service, with whom David L. Norman and Laurie B. Davis, Public Defender Service, were on the brief, for appellants.

Leslie A. Blackmon, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellees.

Erias A. Hyman, Acting Corporation Counsel at the time the brief was filed, with whom Charles L. Reischel, Janet L. Maher and Diane Lucas, Assistant Corporation Counsels, filed a brief on behalf of the District of Columbia as amicus curiae.

Before WAGNER, Chief Judge, and SCHWELB and KING, Associate Judges.

WAGNER, Chief Judge.

■ Having been found not guilty by reason of insanity of various criminal offenses, both appellants, James L. Brown and John R. Marlowe, were committed for hospitalization at St. Elizabeths Hospital pursuant to D.C.Code § 24–301(d) (1996). Appellants' principal argument on appeal is that they were deprived of their liberty without due process when returned for inpatient hospitalization following their court-ordered conditional release without being accorded the notification and hearing procedures established for civil committees in *In re Richardson*, 481 A.2d 473 (D.C.1984). We hold that the statutory provisions and the Hospital's informal procedures, when followed, comport with the requirements of due process and that the procedures for the temporary rehospitalization of criminal acquittees and civil committees need not be the same in order to meet the requirements of due process. Therefore, it was not required that *Richardson* procedures be followed for temporary rehospitalizations of insanity acquittees previously released under court order.

## I. *Factual Background*

### A. *The Brown Case*

In 1980, Brown was found not guilty by reason of insanity of unlawful entry

(D.C.Code § 22–3102 (1996)) and destroying property (D.C.Code § 22–403 (1996)) and committed to St. Elizabeths Hospital (Hospital) pursuant to D.C.Code § 24–301(d). Beginning in 1982, upon recommendation of the Hospital, the court entered a series of orders for Brown's conditional release under certain specified conditions which became progressively less restrictive. The order entered on August 7, 1986 permitted Brown to reside outside of the Hospital in a setting approved by the Hospital with the conditions that he maintain employment, report regularly to the Hospital's outpatient department, and take prescribed medication. This order, like the three preceding orders, authorized the Hospital to return Brown to inpatient status if his "mental condition deteriorat[ed] to the extent that he becomes dangerous to himself or others or, should he violate the conditions of ... release, ... with due notification to the Court and counsel and without prior hearing before [the] Court."

Between 1986 and 1991, Brown returned to the Hospital periodically for inpatient care, both voluntarily and involuntarily, and the Hospital typically informed the court of Brown's change in status. On October 8, 1991, the Hospital returned Brown to inpatient status and placed him in a maximum security ward because his mental condition had deteriorated and he had violated his release conditions. Brown had left the Hospital-approved residential facility, quit his job, and used alcohol, and he was arrested in Maryland on charges of driving while under the influence of alcohol, unauthorized use of a vehicle and evading the police. In December 1991, the Hospital transferred Brown to a minimum security ward and authorized his conditional release on Christmas and New Year's Day. The Hospital recommended Brown's conditional release in early 1992.[1]

On January 31, 1992, Brown filed a motion for release under the 1986 order and for modification of the order to include the procedures established for the rehospitalization of civilly committed outpatients as set forth in *Richardson, supra.* The court treated the motion as a request for conditional release under D.C.Code § 24–301(k) (1996) and scheduled a hearing for March 17, 1992. After a series of continuances, the Hospital informed the court that it would recommend outplacement if Brown consented to certain conditions. On September 15, 1992, the court (Judge Robert I. Richter) entered an interim consent order for Brown's conditional release with the conditions proposed by the Hospital.[2] This order also contained a provision authorizing the Hospital to return Brown to inpatient status for violation of the conditions of release or a deterioration of his mental condition, "with due notification to the court and counsel," but without a prior hearing. Brown objected to this return provision. The trial court (Judge Richter) ruled that Brown's challenge to the return provision was not "ripe for adjudication," and allowed the interim release order to stand. Brown noted an appeal from the court's order on January 25, 1993.

On November 15, 1993, Brown was returned to inpatient status and placed on a maximum security ward, and the Hospital so informed the court by a letter dated November 18, 1993. A copy of the letter, which stated that the Hospital had determined that Brown's mental condition had deteriorated, was received by Brown's counsel on November 23, 1993, and file-stamped by the Superior Court on December 3, 1993.

On December 3, 1993, Brown filed an emergency motion for release or for an order to show cause why his inpatient detention did not violate his due process rights. Brown argued that he was entitled to the same rights as those accorded civilly committed outpatients under *Richardson, supra.* Specifically, he contended that he was entitled to release because of (1) the Hospital's failure to file a detailed notice of rehospitalization with the court and counsel within twenty-four

---

1. On December 12, 1991, Brown filed a motion to show cause why he should not be able to resume outpatient treatment during the upcoming holidays. This motion, however, was dismissed after the Hospital agreed to allow Brown temporary leave during the holidays.

2. The order contained the same conditions as the earlier one, but included in addition that Brown (1) refrain from using illicit drugs or alcohol and (2) participate in an Alcoholics Anonymous program at least three times per week, with verification of his attendance.

hours of his return to inpatient status, (2) the absence of a finding by the court that the need for rehospitalization was supported by probable cause, and (3) his detention at the Hospital for eighteen days without judicial review of the *"de facto"* revocation of his conditional release and outpatient status.[3] On December 21, 1993, after a hearing on the motion, the court (Judge Frederick H. Weisberg) rejected Brown's claims, along with similar claims advanced by appellant Marlowe, for the reasons explained later in this opinion. The court set a hearing for January 4, 1994, to resolve the merits of the Hospital's decision to rehospitalize Brown. On December 28, 1993, Brown noted an appeal from the order of December 21, 1993. (App. No. 94–CO–75).

Brown agreed to postpone the hearing scheduled for January 4th after learning that the Hospital did not intend to continue him on inpatient status for any extended period.[4] Subsequently, Brown resumed outpatient status after consenting to minor modifications of the conditional release order. The modified order, entered on April 12, 1994, provided for Brown's rehospitalization in the event of his violation of release conditions, commission of a criminal offense, mental deterioration, or reduction of therapeutic drugs below acceptable levels, "provided [Brown] is afforded, at a minimum, such notice and opportunity for hearing as due process requires."

### B. *Marlowe's Case*

On April 23, 1985, following a stipulated trial, appellant Marlowe was found not guilty by reason of insanity of second degree burglary, two counts of destroying property and second degree theft. On March 3, 1988, Marlowe filed a motion, pursuant to D.C.Code § 24–301(k), for conditional release which would allow him to live with his family in New York State and receive outpatient treatment at the Rochester Psychiatric Center (Psychiatric Center). The motion proposed a release order that authorized the center to return Marlowe summarily to inpa-

tient status "in its sole discretion" if he violated the conditions of release or if his mental condition deteriorated.

The court entered an interim release order on August 2, 1988, with conditions approved by the Hospital, which allowed Marlowe to travel to New York for an in-person evaluation. Among the conditions were that the Hospital could withhold the release if Marlowe's mental condition deteriorated. On September 20, 1988, the court issued another order for conditional release that allowed Marlowe to reside with his mother for thirty days and to be evaluated for outpatient treatment at the Park Ridge Community Mental Health Center (Park Ridge). This order required Marlowe to maintain close contact with the Hospital, keeping it informed of his psychiatric treatment. The order also required the Hospital to seek Marlowe's immediate return pursuant to D.C.Code § 24–301(i) (1996) if he violated any condition of release or if it received "information from any source indicating a deterioration in Mr. Marlowe's mental condition." On October 28, 1988, the court (Judge Luke Moore) entered an order which required Marlowe to continue his outpatient treatment at Park Ridge and to reside with his mother until Park Ridge consented to his move to another address. The order required Park Ridge to notify the Hospital by telephone if Marlowe failed to continue his treatment and respond reasonably to all legitimate inquiries concerning his location, treatment and mental state made by the Superior Court, the Hospital, or the U.S. Attorney's Office. This order did not contain a provision for summary rehospitalization as the earlier orders did.

Marlowe was convicted of second degree burglary in New York, and on November 23, 1990, he commenced serving a sentence of two to six years at the Elmira Correctional Center in Elmira, New York. On April 9, 1991, the Commission on Mental Health (Commission) notified the Superior Court "so that a Detainer can be issued for [Marlowe's] return to Saint Elizabeths Campus for evaluation and treatment." The Commission sent

---

3. Brown moved for a stay of his prior appeal from Judge Richter's order.

4. Prior to the hearing on Brown's motion, he had been granted conditional release for employment purposes.

a copy of its letter to the United States Attorney's Office, but it did not notify Marlowe's counsel of record. On April 16, 1991, the Superior Court (Judge Franklin Burgess, Jr.) entered a Forthwith Attachment Order of Return, directing the United States Marshal to return Marlowe to the Hospital upon release from the Elmira Correctional Center, and thereafter, the U.S. Marshal filed a detainer for Marlowe with the Center.

On January 7, 1993, the Hospital informed the Superior Court by letter that Marlowe was scheduled to appear before the parole board in New York in October 1993, with a conditional release date of November 28, 1993, and that a detainer was on file at the Correctional Facility. Marlowe's counsel did not learn of the detainer until Marlowe contacted him. On November 10, 1993, Marlowe's counsel filed an emergency motion to vacate the attachment order and thereby remove the detainer. However, Marlowe's release date was advanced, and he was taken into custody by the Marshal on November 19, 1993, before the motion had been decided. Marlowe's counsel filed a second emergency motion for release from custody, arguing that the attachment order was unauthorized and improper. The government opposed the motion, and the court (Judge Weisberg) denied it after a hearing held on December 21, 1993. Marlowe noted an appeal from this order.

The court granted Marlowe's request for a prompt hearing to determine whether indefinite inpatient hospitalization was the least restrictive alternative and set a hearing for January 4, 1994. Marlowe agreed to three postponements of the hearing because the Hospital indicated that he did not seem to require long-term hospitalization. When he was not released as quickly as he had hoped, Marlowe requested, and was granted, a hearing on his motion for restoration of conditional release and return to New York under a modified version of the 1986 order. After argument, Judge Weisberg denied the motion.

### C. The Trial Court's Ruling on Appellants' Richardson Claim

At a hearing on December 21, 1993, Brown and Marlowe argued that due process required that insanity acquittees be afforded the same protections conferred upon civil committees before they can be rehospitalized following conditional release to live in the community. Observing the differences between the requirements for commitment and release of insanity acquittees and civil committees, the trial court (Judge Weisberg) rejected appellants' argument that the procedures for the two categories of patients must be the same in order to comport with the requirements of due process. In so ruling, the court stated in part as follows:

> Due process, according to the Supreme Court in *Morrissey v. Brewer* [408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)], which is a somewhat analogous context … is a flexible concept and calls for whatever procedural protections the particular situation demands. In my judgment, this situation demands the right to notice of rehospitalization and a prompt judicial determination if requested by the patient that the rehospitalization is justified and consistent with the needs of the patient and the needs of the community. In my judgment further, the due process rights of these patients were not violated in either case. In both cases within five days of rehospitalization, the hospital sent a letter as it's required to do to the Court and to counsel notifying the Court and counsel of rehospitalization. In each instance, that triggered the right of the patient through counsel to seek a hearing under [D.C.Code § 24-] 301(k) or on motion to enforce the conditional release to challenge the validity for the hospital's decision to rehospitalize each patient.

The court further rejected the claim that the remedy for violation of the procedures outlined required immediate release of the patient, concluding that the remedy was for the patient to demand a prompt judicial hearing.

### II.

Appellants argue that they have been denied due process because they were returned to inpatient status without being accorded the procedures established for the rehospitalization of civil committees in *Richardson*,

*supra.* They seek reversal of the trial court's orders denying their return to outpatient status under the existing conditional release orders. They also seek remand of the cases to the trial court for amendment of the conditional release orders with a specification of *Richardson* procedures to be followed when it is alleged that an acquittee has violated the conditions of release or that his mental condition has deteriorated to the extent that he poses a danger to self or others if maintained on outpatient status. The government contends that the insanity acquittee's statutory right to challenge summary rehospitalization satisfies due process requirements and that an extension of *Richardson* procedures to insanity acquittees is unnecessary and inappropriate. The issue presented by these arguments has not been decided previously by this court. Before addressing the question, we review briefly our holding in *Richardson* and the procedures followed currently for the rehospitalization of insanity acquittees.

## A. *"Richardson Rights"*

In *Richardson, supra,* this court considered whether the conditional release order for patients committed to St. Elizabeths Hospital civilly, pursuant to D.C.Code § 21–545 (1989), "may authorize the patient's summary return to the Hospital for a brief period of reevaluation and treatment in the event his condition deteriorates or he fails to comply with the terms of the outpatient treatment program." *Richardson,* 481 A.2d at 479. This court held that the patient may be rehospitalized under such a provision provided the patient is detained only temporarily and certain procedures are followed. *Id.* at 483–84. Specifically, these procedures, which we deemed to be in harmony with due process, require that the Hospital provide the court and the patient's counsel with (1) an affidavit within twenty-four hours setting forth facts from which the court can find affirmatively that the patient's return for treatment is supported by probable cause; and (2) written notice to the patient and counsel "that the Hospital must either release him after the fifth day of institutional care and observation, or thereafter move for a prompt adversary judicial hearing seeking

the permanent revocation of his outpatient status." *Id.* at 480–81. We concluded that these procedures adequately guarded against the erroneous deprivation of the outpatient's interest in the continued enjoyment of his conditional release pending the disposition of the requisite medical and factual determinations. *Id.* at 482, 483. Appellants contend that the same principles which guided this court's decision in *Richardson* apply equally to individuals committed to the Hospital under D.C.Code § 24–301(d) following a finding of not guilty by reason of insanity.

## B. *Current Hospitalization, Rehospitalization, and Release Procedures for Insanity Acquittees*

The commitment and release of insanity acquittees is governed by D.C.Code §§ 24–301 to –303 (1996). Requests for release, conditional release or a change of the conditions of release for the patient may be initiated by the Hospital. D.C.Code § 24–301(e). However, pursuant to D.C.Code § 24–301(k)(2) and (5), an insanity acquittee may file a motion for release every six months, and for good cause shown, the court, in its discretion may consider such motions more often. Under these same provisions, acquittees who have been released conditionally can move for unconditional release, a change in conditions of release, or for other relief related to their hospitalization. D.C.Code §§ 24–301(k)(1), (2), and (3). The burden is on the acquittee to show, by a preponderance of the evidence, that he or she is entitled to the relief requested. D.C.Code § 24–301(k)(3). If applying that standard the court finds "that the person is entitled to his release from custody, either conditional or unconditional, a change in the conditions of his release, or other relief," the court must enter an appropriate order. *Id.* If relief by motion proves to be inadequate or ineffective to challenge the validity of the person's detention, an application may be made on that person's behalf for a writ of habeas corpus. D.C.Code § 24–301(k)(7).

Currently, there are no statutory or other rules prescribing the procedures to be followed by the Hospital when returning an insanity acquittee, who has been living in the

community pursuant to a conditional release order, to full inpatient status at the Hospital.[5] However, according to the record in this case, the Hospital has an informal procedure which it follows in such cases. Specifically, after an acquittee is returned to inpatient status, the Hospital notifies the court by letter of the patient's return, "as soon as is practicable, generally within 5 business days." The Hospital also mails a copy of this letter to the acquittee's last known counsel. The Hospital includes in the letter information about the date and reason for the patient's return. The patient is then placed in an admissions unit for evaluation and treatment. If the patient has not been returned to the community within sixty days, a treatment team recommends the patient's placement in a maximum, medium or minimum security ward, or for return to the community, consistent with the patient's condition. If the patient is recommended for a minimum or medium security ward, the Hospital will not request revocation because it anticipates that the patient will soon resume some form of conditional release.

The Hospital may recommend a change in the patient's status or conditions of release under D.C.Code § 24–301(e). Action under this section requires notification of the original prosecuting authority, either the United States Attorney or the Corporation Counsel, who may object or support the recommendation. *Id.* The court may hold a hearing in its discretion, or upon objection by the prosecuting authority in the case, must hold an evidentiary hearing. *Id.* If revocation proceedings are not initiated by the Hospital, the acquittee may challenge the withholding of his conditional release privileges by filing a motion under D.C.Code § 24–301(k)(5) or by applying for a habeas corpus if it "appears that the remedy by motion is inadequate or ineffective to test the validity of his detention." D.C.Code § 24–301(k)(7).

## III. *Bases for Differences in Treatment*

In other contexts, it has been held that release standards and other procedures that apply in the cases involving civil committees

may be inappropriate in matters involving criminal insanity acquittees. *See, e.g., Jones v. United States,* 463 U.S. 354, 367, 369, 103 S.Ct. 3043, 3051, 3052, 77 L.Ed.2d 694 (1983); *Reese v. United States,* 614 A.2d 506, 511 (D.C.1992); *see also United States v. Ecker,* 177 U.S.App. D.C. 31, 48, 543 F.2d 178, 195 (1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977). In *Reese,* based upon the different statutory schemes governing the hospitalization of insanity acquittees and civil committees, we held that the "least restrictive treatment" standard operates differently. *Reese,* 614 A.2d at 510. For civilly committed mental patients, "[o]nce the court orders a patient's commitment, the Hospital is obligated to follow the least restrictive form of treatment." *In re James,* 507 A.2d 155, 157 (D.C.1986) (citing *Richardson, supra,* 481 A.2d at 480). However, for committed acquittees, we have recognized that while "[t]he nature of the acquittee's treatment while confined may be relevant to the level of custody . . . . it is to be weighed in the context of affording reasonable assurances of public safety." *Reese,* 614 A.2d at 511 (citing *De Veau v. United States,* 483 A.2d 307, 312 (D.C.1984)). The court is obligated to make its own judicial determination that the acquittee patient has recovered sufficiently such that under the proposed conditions for release the person will not in the reasonable future be dangerous to himself or others. *Ecker,* 177 U.S.App. D.C. at 37, 543 F.2d at 184 (quoting *Hough v. United States,* 106 U.S.App. D.C. 192, 195, 271 F.2d 458, 461 (1959)).

The civil commitment, by contrast, "reflects a 'profound congressional concern for the liberties of the mentally ill.'" *In re Plummer,* 608 A.2d 741, 746 (D.C.1992). In *Ecker, supra,* in addressing the differences in treatment accorded the two categories of patients, the court observed that it had accepted since 1958 the proposition that "dangerousness demonstrated by the commission of a crime and acquittal by reason of insanity constitutes a rational basis for the disparity in release provisions governing acquittees and committees." 177 U.S.App. D.C. at 48, 543 F.2d at 195; *see also Overholser v.*

---

**5.** It has been reported that a subcommittee of the Superior Court's Pretrial Mental Examination

Committee is considering addressing this issue by rule.

*Leach,* 103 U.S.App. D.C. 289, 291–92, 257 F.2d 667, 669–70 (1958) (insanity acquittees are an "exceptional class of people" who are "treated by Congress in a different fashion from persons who have somewhat similar mental conditions, but who have not committed offenses or obtained verdicts of not guilty by reason of insanity at criminal trials").

The statutes governing the release and conditional release of the two categories of patients are significantly different. For example, the Ervin Act,[6] which governs patients civilly committed under court order, provides for the patient or someone acting on his or her behalf, to request a current mental examination from the chief of service of the Hospital, and the chief of service is required to order the patient's immediate release if the reports of the qualified professionals lead to the conclusion that "the patient is no longer mentally ill to the extent that he is likely to injure himself or others." D.C.Code § 21–546. If the chief of service determines that the patient continues to require hospitalization, but at least one of the physicians or psychologists who examined the patient has determined that release is appropriate, then the patient may petition the court for an order directing his release. *Id.* Statutory responsibility for monitoring the patient's progress and releasing the patient immediately upon a determination that hospitalization is no longer necessary is reposed in the chief of service of the Hospital. D.C.Code § 21–548. Under this statutory scheme, the Hospital has the authority to restore conditional release privileges of civilly committed patients after revocation.

Unlike the procedure for civil committees, the Hospital can not restore conditional release privileges after revocation, but must await court approval. *Compare* D.C.Code §§ 21–546(a) and –548 with D.C.Code §§ 24–301(e) and –301(k). However, an acquittee may seek release or conditional release periodically by direct application to the court. D.C.Code § 24–301(k). There is no requirement of a preliminary request to the chief of the hospital before judicial review of an acquittee's request for release or conditional release. *See id.*

### IV. *De Facto Revocation Claim*

■ Appellants contend that where the court has granted an insanity acquittee conditional release, the Hospital has no authority to return the acquittee to inpatient status without judicial authorization, and the available statutory remedies, when it exercises such authority, are inadequate under these circumstances to meet the requirements of due process. Appellants' argument that a court order was required before they could be returned to inpatient care is premised on the claim that the temporary suspensions of their outpatient status constituted *de facto* revocations. We do not regard the suspensions that way. Marlowe's return to the Hospital was pursuant to an order of court, not by summary action of the Hospital. Brown's return to the Hospital for inpatient treatment was typically temporary. Although the Hospital returned Brown to inpatient status in October 1991, two months later, he was released conditionally for holidays. A few months later, he was released for work, and in September 1992, the Hospital approved his outplacement in the community with modifications of the conditions of release, to which Brown did not object. Similarly, shortly after his rehospitalization in November 1993, Brown was released by the Hospital for work, and by April 1994, the Hospital had agreed to Brown's resumption of outpatient status. Moreover, the court's orders releasing Brown expressly conferred upon the Hospital the authority to suspend temporarily his outpatient status when his mental health required it. We find nothing in the statute which precludes the court from authorizing the Hospital responsible for acquittee-patient's treatment to return the patient temporarily for inpatient care under circumstances which warrant it with the view toward assimilating the patient back into the community when consistent with the safety of the community and the patient. *See Richardson, supra,* 481 A.2d at 480. Such measures are consistent with the statutory goals of assuring the patient's recovery and protecting public safety. *See Reese, supra,* 614 A.2d at 511 (citation omitted). Therefore, we

---

6. Hospitalization of the Mentally Ill Act,      D.C.Code §§ 21–501 to –592 (1989) (Ervin Act).

do not regard the Hospital's decision to return a patient to the Hospital temporarily for treatment pursuant to its authority under court order, when properly exercised, to be equivalent to a revocation of conditional release.

## V. *Appellants' Due Process Challenge*

Appellants challenge, as contrary to due process requirements, the procedures used by the Hospital in detaining them as inpatients after their release from the Hospital on indefinite outpatient status pursuant to court order. The government concedes that appellants had a liberty interest implicating the protections of due process. *See Reese, supra,* 614 A.2d at 510 (citations omitted); *see also Plummer, supra,* 608 A.2d at 744 (citations omitted). The question is what process is due, or in this case, what procedural constraints are imposed upon the government before it can deprive an insanity acquittee of his conditional liberty interest. "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey, supra,* 408 U.S. at 481, 92 S.Ct. at 2600. Determination of whether procedures are constitutionally sufficient generally require consideration of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). We consider each of these factors in turn.

### A. *The Private Interest*

■ For purposes of the analysis in this case, it is not disputed that appellants have a conditional liberty interest in remaining in the community when placed on conditional release by court order. However, as discussed in Part III of this opinion, insanity acquittees are subject to different and more restrictive procedures than civil committees for purposes of release and conditional release. Such disparities are deemed to be justified because the acquittee's mental illness has already manifested itself in criminal conduct, and therefore more stringent procedures are required to insure the public safety. *See Reese, supra,* 614 A.2d at 511. Thus, the nature of the private interest to be free of confinement is somewhat more limited than the interest of civil committees with whom appellants seek to compare themselves. *See Sanderlin v. United States,* 254 U.S.App. D.C. 18, 23, 794 F.2d 727, 732 (1986) (A civilly committed person is afforded greater protections against unwarranted confinement than an insanity acquittee.).

### B. *Risk of Erroneous Deprivation of Liberty*

■ The involuntary rehospitalization of a committed outpatient results in a temporary loss of liberty. Procedural due process serves to minimize the risk of the erroneous deprivation of that liberty. *Richardson, supra,* 481 A.2d at 482 (citing *Greenholtz v. Inmates of Neb. Penal & Correctional Complex,* 442 U.S. 1, 13, 99 S.Ct. 2100, 2106–07, 60 L.Ed.2d 668 (1979)). "However, the Due Process Clause 'does not mandate that all governmental decision making comply with standards that assure perfect, error-free determinations.'" *Id.* (quoting *Mackey v. Montrym,* 443 U.S. 1, 13, 99 S.Ct. 2612, 2618–19, 61 L.Ed.2d 321 (1979)). At a minimum, due process requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* at 481 (citing *Mathews, supra,* 424 U.S. at 333, 96 S.Ct. at 902).

■ The Hospital's procedures, if followed, together with statutory hearing rights for insanity acquittees meet due process requirements. Those procedures include a preliminary determination by mental health professionals that circumstances involving the patient's condition warrant at least temporary inpatient examination and care of the patient, consistent with the terms of the conditional release order. We have recognized the court's power to include in its order

authorization to the Hospital to return a patient summarily for observation and treatment under certain circumstances. *Richardson, supra,* 481 A.2d at 481. The Hospital's procedure of providing notice to the court and the patient's counsel, generally within five days of the patient's return, which set forth the reason therefor, along with the right of the patient to move for a judicial hearing pursuant to D.C.Code § 24–301(k) meet the demands of due process.

### C. *The Governmental Interest*

■ The third factor in considering the constitutionality of the process involved is "the government's interest and the extent to which it will be impeded by the use of additional safeguards." *Richardson, supra,* 481 A.2d at 482 (citing *Mathews, supra,* 424 U.S. at 334–35, 96 S.Ct. at 902–03). Appellants contend that the government's interest is the same whether the case involves an insanity acquittee or a civil committee. In both situations, the government has an interest in evaluating and stabilizing the patient and in protecting the patient and the community. Yet, as we have outlined in Part III of this opinion, there is a stronger focus on assuring public safety when an acquittee is involved because of the demonstrated dangerousness manifested in criminal conduct. *See Ecker, supra,* 177 U.S.App. D.C. at 37, 543 F.2d at 184. This concern forms a rational basis for utilizing different procedures for criminal acquittees than for patients whose illnesses have not resulted in criminal activity. *Overholser, supra,* 103 U.S.App. D.C. at 291–92, 257 F.2d at 669–70. In a case involving a civil committee, we observed that "mental illness is a dynamic condition, and speedy intervention is frequently necessary to prevent rapid deterioration of the patients' condition and behavior as well as preserve the advances made towards rehabilitation." *Richardson,* 481 A.2d at 483. Greater safety concerns associated with criminal acquittees may justify even swifter intervention.

Appellants contend that the government's interest in expeditious rehospitalization of the patient when it appears that his condition has deteriorated can be met by application of the *Richardson* procedures. The *Richardson* procedures require the superintendent of the Hospital to file an affidavit within twenty-four hours setting forth facts which support probable cause for the patient's rehospitalization and release of the patient after the fifth day of institutional care and observation unless the Hospital moves for an adversary judicial hearing seeking permanent revocation.[7] *Richardson, supra,* 481 A.2d at 480–81. The government argues persuasively that an extension of *Richardson* procedures to insanity acquittees would impose a rigid timetable upon the difficult process of medically assessing and treating insanity acquittees which would not be in the best interest of the patient or the community. The patient's return to institutional care is not an infrequent occurrence. The requirement of a motion and hearing each time the Hospital deems it necessary to extend treatment beyond five days may hinder the Hospital's ability to respond to the acquittee's changing condition and to meet the goal of assuring public safety. Moreover, the statute governing the hospitalization and treatment for insanity acquittees provides a mechanism for the acquittee to petition for, and to obtain, a judicial hearing if he or she objects to rehospitalization. *See* D.C.Code § 24–301(k). In light of this legislatively-created procedure which is adequate to meet due process concerns, there is no reason for an additional judicially-imposed procedure which does not enhance in any significant way the protection of the patient's interest.

### VI. *Procedure Accorded Brown and Marlowe*

■ Appellant Brown was returned to the hospital on November 15, 1993, and the Hospital informed the court by letter on November 18, 1993, of Brown's readmission. Although counsel did not receive the letter until November 23, 1993, on the eighth day of Brown's return to inpatient care, this period was not so unreasonably long as to violate due process. The notice to the court explained that the basis for the revocation was the deterioration of Brown's mental health. Although general, the notice was sufficient to

---

7. See Part II. A., *supra.*

put Brown on notice of the particular condition requiring his readmission so that he could investigate, with the assistance of counsel, and demand a hearing. Indeed, Brown filed a motion, and a hearing was scheduled on December 21, 1993, less than a month after his summary return to inpatient care. Finally, the trial court scheduled a hearing on the merits of Brown's recommitment, but he postponed it. Subsequently, Brown consented to a modified conditional release order and resumed outpatient status pursuant to it. On these facts, Brown has not demonstrated that he was denied due process in connection with this rehospitalization. He was afforded reasonable notice and an opportunity to be heard at a meaningful time under procedures employed by the Hospital and statutory procedures. *See Mathews, supra,* 424 U.S. at 333, 96 S.Ct. at 902.

■ Since the Hospital did not return Marlowe to inpatient status, there can be no valid claim that the Hospital acted outside its authority as Marlowe contends. It was the court which ordered the issuance of an attachment to insure Marlowe's return to the Hospital upon his release from incarceration in New York. Marlowe contends that the Hospital's unsworn letter, without notice to him or his counsel, was an inadequate basis for the court to issue the attachment which resulted in a detainer being lodged with the New York prison officials. He also seems to contend that only upon request of the government pursuant to D.C.Code § 24–301(i) could the court order his return.[8] As Marlowe concedes, the trial court retains continuing jurisdiction over an insanity acquittee until he or she is released unconditionally. Here, by order, Marlowe's release was conditioned upon his continued outpatient treatment at Park Ridge, residence with his moth-

er, and continued mental stability. Once Marlowe was incarcerated, he necessarily was out of compliance with the court-imposed conditions of his release. The court was obligated upon learning of Marlowe's incarceration after a felony conviction to take steps to assure his return to the jurisdiction and to the Hospital for evaluation of his treatment needs. Although the conditional order of release contained no explicit condition requiring Marlowe to comply with the law, like grants of probation, such a condition must be implicit in such orders. *See Wright v. United States,* 315 A.2d 839, 840 n. 7 (D.C.1974). The report of a law violation is particularly significant for an insanity acquittee whose mental illness has resulted in criminal activity.

■ We reject Marlowe's claim that the court must await a motion by the government under D.C.Code § 24–301(i) before taking steps to assure the patient's return to the Hospital for assessment. Since the court can delegate to the Hospital the authority to return the conditionally released acquittee to the hospital summarily, it surely can rely upon the Hospital's report as a basis for ordering the patient's return to the District for temporary hospitalization to ascertain his status when the conditions deemed to be essential for his community placement are not being observed.

## VII. *Conclusion*

Since we conclude that the statutory procedures and the Hospital's informal procedures, when followed, comport with the requirements of due process, there is no need for a remand, as appellants request, for a specification of the procedures to be followed for the temporary return of the insanity acquittee to the hospital under court order.[9]

---

8. D.C.Code § 24–301(i) provides in relevant part:
   When a person has been ordered confined in a hospital for the mentally ill pursuant to this section and has escaped from such hospital, the court which ordered confinement shall, upon request of the government, order the return of the escaped person to such hospital.

9. Appellants' remaining non-*Richardson* claims appear to be moot and come within no exception

to the mootness doctrine. It is reported that a new order of conditional release to outpatient care was entered on April 12, 1994 for Mr. Brown which contains conditions to which he agreed, including a return provision stating that the Hospital may rehospitalize him provided he is afforded notice and an opportunity for hearing

For the foregoing reasons, the orders of the trial court are

*Affirmed.*

consistent with due process requirements. Following a hearing on June 14, 1994, the trial court determined that Marlowe could not safely return to New York under the earlier conditions. Therefore, alternative conditions are being negotiated.